[Civ. No. 8653. Fourth Dist., Div. Two. Feb. 21, 1968.]

ORANGE EMPIRE NATIONAL BANK, Cross-complainant and Respondent, v. LOWELL O. KIRK, Cross-defendant and Appellant.

348

Cossaboom & Gunderman, James D. Riddet and Gary E. Gunderman for Cross-defendant and Appellant.

Launer, Chaffee & Hanna and Daniel L. Stack for Cross-complainant and Respondent.

KERRIGAN, J.—On July 16, 1965, the Orange Empire National Bank filed a cross-complaint for $50,000 against several parties, including the cross-defendant Lowell O. Kirk, M.D. The bank's cross-action was predicated on a continuing guaranty which was allegedly signed by several cross-defendants, including Kirk. The bank's cause of action arose as a result of a lawsuit filed by certain plaintiffs and cross-defendants who sought cancellation of the aforesaid written guaranty on the ground of fraud. However, Kirk was not a party-plaintiff in the action on the complaint.

Following the filing of the cross-complaint, Dr. Kirk was personally served on July 21, 1965, with a copy of the summons and complaint, and within five days he delivered the process to his attorney, James C. Monroe. Attorney Monroe assured Kirk that he would represent him and take the legal steps necessary to preserve his rights. Kirk informed Monroe that he had never signed the guaranty on which the bank based its cross-action, and that his purported signature was a forgery.

Thereafter, Kirk had numerous conversations with attorney Monroe concerning the lawsuit. On each occasion Monroe informed Kirk that he was taking care of the case for him.

On October 12, 1965, no appearance having been filed upon Kirk's behalf, the bank filed a request for entry of default against him. On December 6, 1965, attorney Monroe wrote the bank's counsel requesting that the default be set aside. On December 8, 1965, the bank's attorney informed Monroe that his request for a stipulation to vacate the default was denied inasmuch as Kirk had signed the guaranty and had no meritorious defense.

In early 1966, the exact date of which is unknown, Kirk received a telephone call from a Riverside attorney who stated that he represented the plaintiffs in the primary action; he informed Kirk that the case was going to trial in a few days and asked whether Kirk had any defense to the action; Kirk replied that he had never signed the guaranty; counsel requested the name of Kirk's attorney and was informed of Monroe's representation.

Following this telephone contact, Kirk immediately called attorney Monroe, who stated that he had also conferred with plaintiffs' counsel. Monroe further assured Kirk that he was defending the cross-suit and that no judgment would be entered against Kirk; when Kirk inquired about the trial, Monroe replied that he would take care of the trial.

On March 3, 1966, the trial commenced on the issues raised in the complaint and cross-complaint, and neither Monroe nor Kirk appeared for trial. Following the introduction of evidence, a judgment was rendered in favor of the bank against the cross-defendants, including Kirk, in the sum of $50,000 plus attorneys' fees and costs, on the basis of the written continuing guaranty executed by them. Formal judgment was entered on March 15, 1966.

Four days following the trial, after the court had announced its decision but prior to entry of judgment, the

bank's attorney telephoned Kirk and requested payment of the judgment; Kirk told counsel that he should talk to attorney Monroe inasmuch as the latter was representing him, and further advised the bank's counsel that he had no intention of paying the judgment inasmuch as he had not signed the guaranty agreement.

Kirk thereupon immediately called Monroe's office and talked to Mr. Foulds, the office manager, who informed him that Monroe was out of town. Foulds immediately telephoned Monroe, who requested that Foulds call the bank's attorney and inform the latter that Monroe would call him when he returned to the office. Foulds promptly contacted the bank's attorney and told him that the signature on the guaranty was a forgery and that Monroe would contact him when he returned. Foulds then prepared a memorandum to Monroe summarizing the details of Kirk's call and the result of his conversation with the bank's attorney.

When Monroe returned to town a few days later, his office manager again brought the Kirk matter to his attention and Monroe asked Foulds to phone the bank's attorney, but the latter was not available. Monroe then requested Foulds to call the county clerk's office for the purpose of ascertaining the date of service.

Thereafter, on April 4, 1966, the bank's attorney again telephoned Kirk and requested payment of the judgment; again Kirk told the bank's counsel to talk to Monroe, and the latter replied that he was having trouble getting in touch with Monroe, whereupon Kirk stated that he would request Monroe to call him. Kirk called Monroe's office and conversed with Foulds and was advised that Monroe was absent from the city. Following this conversation, Foulds telephoned Monroe and reminded him of Dr. Kirk's case; Monroe told Foulds to do nothing until his return as he would take care of the whole matter.

When Monroe returned to his office, Kirk talked to him and asked him what was going on; Monroe replied that he was getting a transcript of the records so that he could review the case.

Kirk then decided that he should get some independent legal advice so he visited the firm of Coassaboom & Gunderman on July 1, 1966; attorney Gunderman advised Kirk that the only procedure available to him was to apply for relief from default. Gunderman also telephoned the bank's counsel on this occasion concerning Dr. Kirk's problem.

Again Kirk got in touch with Monroe, who indicated that he had sent for the complete file and was taking care of the default. When Monroe failed to respond, Kirk consulted with Gunderman. After checking the court file, Kirk discovered that Monroe had failed to take any action with respect to the judgment, and retained Cossaboom & Gunderman in October 1966 for the purpose of endeavoring to obtain equitable relief.

. On October 24, 1966, Kirk's new counsel filed a motion to vacate the default and set aside the judgment. His motion was supported by his own declaration reciting the foregoing facts relating to his relationship with attorney Monroe, and was corroborated by declarations signed by office-manager Foulds and his new attorney. The bank's counsel filed a counter-affidavit in opposition to the motion in which he stated, *inter alia,* that in the event the motion to vacate the judgment were to be granted, the bank would be prejudiced by an inability to locate material witnesses upon a retrial.

The sole issue to be determined is whether the trial court abused its discretion in denying relief.

. The rule is firmly-established that the granting or denying of a motion to vacate a default rests in the sound discretion of the trial court, and that the order will not be disturbed unless an abuse of discretion clearly appears. (*Yarbrough* v. *Yarbrough,* 144 Cal.App.2d 610, 614 [301 P.2d 426].) With respect to setting aside a default judgment, it is the policy of the law to favor, whenever possible, a hearing on the merits, and appellate courts are much more disposed to affirm an order where the result is to compel a trial on the merits than they are when the judgment by default is allowed to stand and it appears that a substantial defense could be made. (*Benjamin* v. *Dalmo Mfg. Co.,* 31 Cal.2d 523, 525 [190 P.2d 593].) Stated in another fashion, it is the policy of the law to have every litigated case tried upon its merits, and it looks with disfavor upon a party who, regardless of the merits of the case, attempts to take advantage of the mistake, surprise, inadvertence, or neglect of his adversary. (*Weitz* v. *Yankosky,* 63 Cal.2d 849, 855 [48 Cal. Rptr. 620, 409 P.2d 700].) Where, as in the case under review, defendant's motion is made more than six months after entry of default, the motion is not directed to the court's statutory power to grant relief for mistake or excusable neglect (Code Civ. Proc., § 473), but is rather submitted to the court's inherent equity power under which, apart from its statutory authority, the court has the power to grant relief

from a default judgment where there has been extrinsic fraud or mistake. (*Hallett* v. *Slaughter*, 22 Cal.2d 552, 557 [140 P.2d 3].) █ To the extent that the court's equity power to grant relief differs from its statutory power (Code Civ. Proc., § 473), the equity power must be considered narrower, not wider. (*Weitz* v. *Yankosky, supra*, p. 857.)

█ ". . . [W]hile courts . . . are somewhat loath to penalize a litigant on account of some omission on the part of his attorney, particularly where the litigant himself has acted promptly and has relied . . . upon the attorney to protect his rights" (*Stub* v. *Harrison*, 35 Cal.App.2d 685, 689-690 [96 P.2d 979]), generally the litigant must plead that the mistake or neglect on the part of his counsel was excusable as a ground for vacating a judgment by default. (*Fickeisen* v. *Peebler*, 77 Cal.App.2d 148, 150-151 [174 P.2d 883].) █ Although the law ordinarily charges the client with the inexcusable neglect of his attorney, and gives him redress against his counsel (*Benjamin* v. *Dalmo Mfg. Co., supra*, 31 Cal.2d 523, 532), there are exceptional cases in which the client who is relatively free from personal neglect will be relieved from a default or dismissal attributable to the inaction or procrastination of his counsel. (See *Hallett* v. *Slaughter, supra*, 22 Cal.2d 552; *Vartanian* v. *Croll*, 117 Cal.App.2d 639, 644-645 [256 P.2d 1022].) This is particularly true where the attorney's failure to represent the client amounts to positive misconduct. (*Daley* v. *County of Butte*, 227 Cal.App.2d 380, 391 [38 Cal.Rptr. 693].) █ An attorney's authority to bind his client does not permit him to impair or destroy the client's cause of action or defense. (*Daley* v. *County of Butte, supra.*)

Thus, where a client is unknowingly deprived of effective representation by counsel's failure to serve process, to appear at the pretrial conference, to communicate with the court, client, and other counsel, and the action is dismissed by reason of the attorney's misrepresentation, the client will not be charged with responsibility for the misconduct of nominal counsel of record, providing the client acts with due diligence in moving for relief after discovery of the attorney's neglect, and the opposing party's rights will not be prejudiced nor suffer injustice as a result of the granting of relief. (*Daley* v. *County of Butte, supra*, 227 Cal.App.2d 380, 391-392, 395.)

█ To characterize Monroe's utter failure to represent his client as "inexcusable neglect" would be charitable but

hardly candid. His dereliction of the professional obligations owed Dr. Kirk constituted actual misconduct. He was furnished with a copy of the summons and complaint five days after service was accomplished, and agreed to interpose a defense, but failed to file an appearance. His client's default was not entered until some six weeks had expired. He had actual notice of the default entry because he wrote the opposing party's counsel requesting a stipulation that the default be vacated. Notification denying his request was furnished him two days later. Nevertheless, he wrongfully failed to take any action within the statutory period for the purpose of securing relief from default. Moreover, he had advance notice that a trial date had been set in March, and he assured his client that he would handle the defense, but again failed to act. As a consequence of his improper representation, or misrepresentation, a judgment of $50,000 was entered against Kirk. Thereafter, Monroe continued in his reassurances that he would take the action necessary to relieve the client from the sanctions of the judgment, but did nothing to protect the client's rights. It would be difficult to conceive a set of circumstances where counsel displayed a more flagrant disregard for his client's best interests.

The issue next requiring resolution is whether the client himself acted expeditiously in seeking relief upon discovery of his counsel's improper conduct. One moving in equity to set aside a default judgment must act diligently in making his motion after he learns of the default judgment. (*Weitz* v. *Yankosky, supra,* 63 Cal.2d 849, 856-857.) While Kirk initially became aware of the judgment in March 1966 and did not seek formal relief until October 1966, the record under review reflects that he did not ignore the existence of the judgment or the serious financial consequences emanating therefrom. After the bank's counsel telephoned him and demanded payment, he repeatedly called Monroe and received promises to the effect that proper remedial measures were being taken. When unable to confer with his counsel, Kirk conveyed urgent messages to counsel's office manager. In July, Monroe still persisted in his representations that he was securing a transcript and protecting Kirk's interests.

Consequently, it was not until July that the client secured collateral advice and determined the proper procedure for obtaining equitable relief. The same month he conversed with Monroe and was informed that the latter was remedying the default. When Monroe failed to contact him further, Kirk

went to the courthouse and examined the file and ascertained that no procedures had been instituted for securing relief. Consequently, he retained new counsel, and in October 1966, the motion to vacate the default was filed.

While a three-month period transpired between the time Kirk first became cognizant of the judgment and the date he sought other legal advice, and although a period of 2-3 months elapsed between the date when Kirk obtained independent legal advice and the date the motion for relief was filed, such delay should not be fatal. "Clients should not be forced to act as hawk-like inquisitors of their own counsel, suspicious of every step and quick to switch lawyers. The legal profession knows no worse headache than the client who mistrusts his attorney." (*Daley* v. *County of Butte, supra,* 227 Cal.App.2d 380, 392.) Kirk is a medical doctor and, being a professional man, would certainly appreciate the necessity for conferring complete confidence in his attorney. Once he ascertained the proper procedures for obtaining relief, he retained new counsel and moved for relief within a reasonable time. He acted diligently in making his motion after learning of the entry of the default judgment and after ascertaining the legal remedies available to him in order to secure the necessary relief. (See *Weitz* v. *Yankosky, supra,* 63 Cal.2d 849, 856-857].)

Having determined that the client should not be chargeable with the misconduct of his counsel, and that he used due diligence in seeking relief from the default judgment, it then becomes incumbent upon us to ascertain whether the bank would suffer any prejudice in the event the relief were to be granted. Ordinarily, prejudice to the responding party is only important in determining whether the moving party acted diligently in filing his motion for relief from default (see *Weitz* v. *Yankosky, supra,* 63 Cal.2d 849, 857), and we have previously decided such issue in Dr. Kirk's favor. However, the bank's counteraffidavit contains averments to the effect that the whereabouts of two loan brokers who participated in the guaranty transaction are unknown to the bank, and that the bank would sustain prejudice in the event their testimony was not available on a retrial. Nevertheless, it appears clear that the bank was successful in obtaining judgment against several plaintiffs and cross-defendants during the original trial without the testimony of the two loan brokers. Furthermore, the record reflects that Dr. Kirk's only defense is that he did not sign the written guaranty, and that by reason thereof his pur-

ported signature is a forgery. Thus, handwriting experts could verify whether the signature appearing on the written guaranty is Kirk's even in the absence of direct testimony.

In the event the signature on the guaranty is Dr. Kirk's, he will have to satisfy the judgment. In the event the signature is not his, then it would be a miscarriage of justice not to permit him to establish such fact and thereby render him liable for the payment of a $50,000 judgment.

The order denying the motion to vacate the default and the default judgment is reversed.

McCabe, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied March 7, 1968.