[No. H030063. Sixth Dist. July 15, 2008.]

MARK D. SHAPIRO et al., Plaintiffs and Respondents, v.
PAMELA W. CLARK, Defendant and Appellant.

COUNSEL

Ellingson McLay & Scott, Mark G. Bonino, Phuong N. Fingerman, Maria S. Quintero, Hayes Davis Bonino; Clayton & McEvoy and Kevin C. Bedolla for Defendant and Appellant.

Richard A. Kutche for Plaintiffs and Respondents.

OPINION

**RUSHING, P. J.**—Pamela W. Clark appeals from a default judgment and an order denying relief from that judgment unless she posts bond in an amount to secure payment of some $300,000 in compensatory damages plus $1.5 million in punitive damages. She contends that the trial court should have granted relief without conditions. Respondents Mark D. Shapiro and GoGuys, Inc. (collectively, Shapiro), contend that the motion for relief should have been denied outright, and that the conditions are proper. We hold that given appellant's compelling showing of good cause for the minimal neglect reflected in her default, the court would have abused its discretion had it denied relief. We further hold that while the court acted permissibly in conditioning relief on appellant's furnishing an undertaking for compensatory damages, it abused its discretion by requiring security for punitive damages. Accordingly we will modify the order by reducing the amount of security and affirm the order as modified. We will also dismiss appellant's attempted appeal from the underlying default judgment, although that dismissal is inconsequential in the present circumstances.

BACKGROUND

Prior to the commencement of this action, Shapiro brought a suit against appellant's husband, Barry Clark, and Tax Advantage, Inc. (TAI), a business

entity of which Clark was a principal, as well as one Andrew T. Cook, a business associate of Clark's. Although the complaint in that matter is not included in the present record, it appears that Clark and TAI suffered their defaults to be entered, leading to entry on April 25, 2005, of a default judgment against them after a prove-up hearing. The court issued a lengthy statement of decision prepared by respondents' counsel. Although this document is, on the present record, mere hearsay as to appellant, it is attached to the complaint against her, and "made a part [t]hereof," and its contents may therefore be consulted as background for the present controversy, without in any sense accepting them as true.

According to the statement of decision, in February 2003 Shapiro gave $250,000 to Clark and TAI for investment in a hotel project in Stockton. The transaction was reflected in a written agreement containing various representations as to the income to be received from the investment and the security, including personal guarantees, to be provided for it. In May 2003, Shapiro lent another $50,000 to Clark and TAI, of which $40,000 remains unpaid. The court found that Clark and TAI procured these payments by fraud, inducing Shapiro to make them by means of false representations and the concealment of material facts, including that their venture was "vastly undercapitalized and unable to undertake the financial commitment touted to Plaintiffs," that the "loan proceeds were used for purposes other than what was represented to plaintiffs," and that the proposed ventures were, contrary to express representations, "inherently risky and speculative." The court also found that Clark and TAI "knowingly and willingly used plaintiffs' loan proceeds for purposes other than what was agreed upon and represented to plaintiffs and diverted plaintiffs' money to their own use." The court found that Clark's and TAI's conduct breached a fiduciary duty arising from their relationship to Shapiro as tax and financial advisers. The court also found that Clark and TAI had converted the sums in question to their own use, resulting in damages to respondents of $290,000 plus some $33,205 in interest and $36,500 in costs of recovery. The court awarded $1.5 million in punitive damages on a finding that Clark and TAI "acted intentionally, with fraud, malice, and oppression, and demonstrated a subjective motive to inflict injury or believed that injury was substantially certain to occur to plaintiffs as a result of their conduct . . . ."

After entry of this judgment against Clark and TAI, Shapiro exchanged various communications through counsel with Clark, who was unrepresented, concerning a possible resolution of their disputes. These exchanges proved inconclusive.

Shapiro commenced this action on August 3, 2005, by filing a complaint against appellant, Clark, and TAI, of which appellant is alleged to be "an

agent and/or employee . . . ." Although the complaint is heavily burdened with evidentiary and other improper matter, the gist of Shapiro's grievance is that appellant was the beneficiary of transfers of the sums found in the first action to have been fraudulently procured from Shapiro. Thus it is alleged that over a 15-month period ending in May 2003, Shapiro loaned "substantial sums" to Barry Clark, TAI, and Cook. During the last four months of this period, some $298,000 was wired from the bank accounts of TAI to a Florida contractor who had been engaged to improve certain Florida real property then owned by appellant as a married woman, and ultimately held by her and Clark as husband and wife. The first cause of action asserts that these transfers were made in fraud of creditors in that, as relevant here, appellant knew that her husband and TAI "intended to hinder, delay, or defraud the collection of plaintiffs['] aforementioned claims . . . by virtue of [the fact] that she was the spouse of [Barry Clark] and an agent and/or employee of [TAI]."

The complaint also makes some attempt to implicate appellant in the original fraud allegedly practiced upon Shapiro. Thus it is alleged in the second cause of action that appellant and Clark made certain representations to Shapiro while "defendants" suppressed the facts that Clark and TAI were undercapitalized and that the loan proceeds would be used for purposes diverging from their representations; appellant and Clark "also failed to reveal and suppressed the fact that the aforementioned transfers were to be and had been made all for their personal benefit"; these nondisclosures were likely to and did mislead Shapiro in light of other representations; and appellant and Clark made the affirmative representations and nondisclosures "with the intent to induce plaintiffs to extend loans." In the third cause of action Shapiro charges "constructive fraud" in that TAI and Clark "had a confidential and fiduciary relationship to Plaintiffs" which "Defendants" violated by certain misrepresentations and failures to disclose. The fourth through seventh causes of action assert claims for a constructive trust, conversion, conspiracy, and an accounting. In all but the last cause of action, Shapiro alleges that all defendants "acted with intent, fraud, malice, and oppression, and Plaintiffs are entitled to punitive damages in the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00)."

On August 8, 2005, the complaint was served by personal delivery, apparently in Florida, on appellant, Clark, and TAI. Their time to answer or otherwise plead ran 30 days later, on September 7, 2005. (See Code Civ. Proc., §§ 412.20, subd. (a)(3), (4), 585, subd. (b).) Meanwhile counsel for Shapiro continued to exchange e-mail with Clark about settlement. On September 4, appellant's 39-year-old son suffered a "massive heart attack," of which he died on September 8, 2005. On that same date, counsel for Shapiro e-mailed Clark with a specific settlement proposal, stating, "in the event a resolution cannot be reached, a default will be entered on September 15, 2005."

This in effect extended appellant's time to plead through the close of business on September 14. Her son's funeral took place on September 12.

Early on the afternoon of September 14, 2005, Clark e-mailed counsel for Shapiro, expressing the belief that "we are within negotiation range" but warning that if respondents entered defaults the next day there would be no further communication between the parties. At the end of the message he wrote, "I would have responded to you a couple of days ago, but Pamela's son just died on September 8th, and the funeral and burial arrangements and services have taken all of our time over the past few days." Counsel replied that Shapiro was "very disappointed" with Clark's response to his offer, concluding, "Given that a resolution has not been reach[ed], please be advised that Mr. Shapiro has instructed me to move forward with the entry of default" in this matter.

On September 15, respondents requested, and the clerk duly made, entries of default as to all three defendants. On October 3, 2005, Shapiro applied to the court for entry of a default judgment. On October 17, 2005, the court entered judgment in Shapiro's favor and against all defendants, jointly and severally, for $298,558.37 in compensatory damages, $72,147.60 in interest, $477.50 in costs, and $1.5 million in punitive damages, for a total of $1,871,183.47. The judgment was accompanied by a 19-page statement of decision prepared by Shapiro's counsel.

On December 12, 2005, appellant filed a motion to set aside the default and default judgment together with a proposed answer. Clark and TAI did not join in the motion. The chief arguments in its support were that appellant's failure to file a timely response to the complaint was excusable, respondents suffered no prejudice as a result of it, and the delay in seeking relief was also excusable. Appellant also argued that Shapiro had identified no adequate basis for charging her with any liability that might have accrued in Shapiro's favor against Clark and TAI. In support of the motion, appellant submitted a declaration setting forth the facts of her son's death and other matters impeding her response to the complaint. Clark separately declared that when settlement negotiations appeared to break down on September 14, 2005, he "told Pamela to file an answer to the complaint because I felt [counsel for Shapiro] was being unreasonable." Pamela declared that when her husband told her she "needed to respond to this case," she secured the assistance of her brother, a Florida lawyer, to prepare an answer in propria persona. She tried to file the answer by fax on September 15, 2005, but it "was rejected for filing because a default had been entered against me earlier that day." Clark made contact with a California attorney on September 20, 2005, but his engagement to act on appellant's behalf was delayed by various intervening events including a household move, delays in securing telephone service as a

result of demands on telephone company resources due to two hurricanes and a telephone workers' strike, and delays in securing access to the superior court's files in this matter because they had been transmitted to a courtroom for the prove-up hearing on the defaults. Appellant's counsel declared that the filing of the motion for relief was further delayed by exigent demands of his own caseload.

In opposition to the motion for relief, respondents contended that appellant "does not have a meritorious defense, she has not submitted a satisfactory excuse for not presenting a defense to the Subject Complaint; she has not demonstrated diligence in seeking to set aside the default once it was discovered; she has not satisfied the requirements of [Code of Civil Procedure section 473, subdivision (b)]; and . . . Plaintiffs will be unduly and irreparably harmed and prejudiced if the motion is granted." The claim of prejudice was based upon the premise that appellant and Clark were building a house on the Florida property and that once the house was completed they would be able under Florida law to claim "an unlimited homestead exemption thereby shielding [themselves] from Plaintiffs['] collection efforts." Shapiro argued that if relief were to be granted, it should be on conditions including that appellant "post a bond in a sum equal to the amount of the default judgment."

After proceedings, described more fully below, the court took the matter under submission to consider the amount of a bond and of respondents' attorney fees. On February 9, 2006, the court entered its order, stating that appellant's motion for relief is "DENIED until and unless the following conditions are satisfied and continuously maintained: (a) that defendant Pamela W. Clark post a bond in the sum of $1,800,000.00 no later than February 14, 2006, and that the bond is to remain valid and posted with this Court for the duration of the litigation; and (b) that defendant Pamela W. Clark pay plaintiffs Mark D. Shapiro's and GoGuys, Inc.'s costs and attorney's fees incurred in obtaining the default judgment in the sum of $2,500.00 $14,500.00 no later than February 14, 2006." The figure of $1.8 million was written in by hand, and the figure of $2,500 was struck out by hand, with $14,500 written in its place. The order further directed that the Florida property "shall not be homesteaded and/or transferred, conveyed and/or encumbered pending satisfaction of these conditions."

Appellant took this appeal from the order and the underlying default judgment.

DISCUSSION

## I. *Appellate Jurisdiction*

Appellant seeks on this appeal to challenge both the trial court's conditional order on her motion for relief from default, and the underlying default judgment. Both were specified in a single notice of appeal, which she filed on April 6, 2006. However, the default judgment was entered, and notice of its entry served on October 17, 2005—some 171 days before the appeal was taken. Ordinarily, appellant's time to appeal from the judgment would have expired on December 16, 2005, 60 days after service of notice of entry of the judgment. (Cal. Rules of Court, former rule 2(a)(2); see now rule 8.104(a)(2).) Appellant did not appeal within that time, but on December 12, 2005, she filed her motion to set aside the default judgment. We may assume for present purposes that this triggered former rule 3(b) of the California Rules of Court (see now rule 8.108(c)), under which a motion to vacate the judgment extends the time to appeal from the judgment until—as relevant here—30 days after service of notice of entry of an order on the motion. That period ran from February 9, 2006, when counsel for respondents served a notice of entry of the order. The 30-day period therefore expired on March 11, 2006, a Saturday, making Monday, March 13, 2006, appellant's last day to appeal from the underlying judgment. (See Code Civ. Proc., §§ 12, 12a; Gov. Code, §§ 6707, 6800.)

Appellant asserts that the defects in the default judgment are jurisdictional, and can therefore be raised on appeal from an order denying a motion to set aside the judgment. However, as discussed in more detail in the following part, the order here was, despite being couched as a conditional denial of relief, in law and effect a conditional grant of relief. Moreover, the authority cited by appellant does not support the proposition for which she cites it. In *Stevenson v. Turner* (1979) 94 Cal.App.3d 315 [156 Cal.Rptr. 499] (*Stevenson*), the appeal was taken directly from the default judgment. This is somewhat puzzling, since the court appeared to conclude that the motion for relief from default had been brought more than six months after the judgment, and if that was true, any later appeal was certainly untimely. (See *id.* at p. 318.) That we are forced to infer critical details, however, says much about the care with which the jurisdictional issues in the case were addressed. Ultimately the court held that it had the discretion to consider whether the judgment was defective for noncompliance with Code of Civil Procedure section 425.11, even though the point was not raised in the trial court, and that the judgment should be reversed on that ground. (94 Cal.App.3d at pp. 319–320.) There is no treatment of any question of appellate jurisdiction other than the dictum, "An order denying relief from default is not appealable, although the propriety of the order may be reviewed on appeal from the judgment." (*Id.* at p. 317.)

This dictum appears inimical to a finding of jurisdiction here; indeed, appellant follows her citation of *Stevenson* with a contrary proposition: "Further, the order denying the motion to vacate, itself, is an appealable order." The cases, or at least dicta extracted from them, suggest some disarray on this point. This may be attributable, at least in part, to failure to distinguish between a prejudgment denial of relief from default, and a postjudgment denial (or grant) of relief from the default and the judgment. The former is an interlocutory order and not separately appealable. (See *Jade K. v. Viguri* (1989) 210 Cal.App.3d 1459, 1465–1466 [258 Cal.Rptr. 907].) The latter is a special order after judgment on a statutory motion to set aside the judgment, and as such is appealable. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 154, pp. 218–219; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 2.171, p. 2-93 (rev. # 1, 2007); *Jade K. v. Viguri, supra,* 210 Cal.App.3d at p. 1469; *County of Stanislaus v. Johnson* (1996) 43 Cal.App.4th 832, 834 [51 Cal.Rptr.2d 73] [granting relief].)

We conclude that while we have jurisdiction to review the order conditionally granting relief from default, the appeal is untimely insofar as appellant seeks to appeal from the default judgment. Under our view of the case, this conclusion has limited effect on the outcome. We will decline to consider the questions—not raised in the trial court—whether the judgment is defective for want of evidence to sustain an award of punitive damages, or for noncompliance with Code of Civil Procedure section 425.11. However, since we strike the most onerous of the conditions on which relief was predicated, appellant will presumably obtain the vacation of the judgment by complying with the remaining condition. If she does not, and if the judgment is indeed void as she claims, she may have other remedies. We hold only that the present appeal is not timely as to that judgment.

## II. *Entitlement to Relief*

### A. *Scope of Review*

Both parties devote considerable attention to the question whether appellant established the conditions for relief under Code of Civil Procedure section 473, subdivision (b) (section 473(b)), which empowers the court to "relieve a party or his or her legal representative from a judgment, . . . or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." This question would be squarely tendered if respondents had appealed from the order conditionally granting relief. They did not. Accordingly there is no appeal before us on which to predicate an order reversing the grant of relief. The sole appeal before us is brought by appellant, who was not aggrieved by the order insofar

as it granted relief, but only by the trial court's imposition of conditions. Our options are to affirm the order in its entirety, modify as to the conditions and affirm, or reverse as to the conditions only.

This conclusion is not altered by the fact that the order purports to *deny* relief "unless" certain conditions are satisfied. There is neither precedent nor authority for such an order. Section 473(b) empowers the court to "relieve a party"—i.e., *grant* relief—"upon any terms as may be just." (See 8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, § 186, p. 693, quoting § 473(b) ["Relief is *granted* 'upon any terms as may be just.' " (Italics added.)].) This is manifestly what the court here intended to do. In orally pronouncing its ruling at the hearing, the court said, "I'm going to grant the relief that he has asked for. I will grant the motion to set aside the default, but it's going to be conditioned on posting of a bond . . . ." The clerk's minute order is faithful to this pronouncement, stating that the motion was "conditionally granted." It further recited that the "order" was "taken under submission." From the oral proceedings it appears that the purpose of the submission was to permit the court to consider the amount of the undertaking and attorney fees it intended to require. Instead of submitting an order conforming to the one pronounced by the court, however, counsel for Shapiro submitted the order now before us, which declares appellant's motion "DENIED until and unless the following conditions are satisfied . . . ."

■ It would be idle to speculate about counsel's motives for preparing such an unorthodox order. However strangely worded, the order's purpose and effect was to conditionally *grant* relief. If respondents wished to obtain a reversal of that grant, it was incumbent upon them to file a cross-appeal. Having failed to do so, they may urge error in the order only as it may bear upon the question "whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken." (Code Civ. Proc., § 906.) In other words, it is open to respondents to contend that appellant has no cause to complain of the conditional nature of the order, because she was not entitled to any relief at all.

■ This, however, is an uphill climb. To affirm the imposition of an unreasonable condition on this rationale, we have to conclude that *as a matter of law* the facts before the trial court could not justify relief. Again, the statute authorizes the trial court to *grant* relief on the finding of certain predicate facts, and to impose such "terms as may be just." (§ 473(b).) This gives the court three choices: Deny relief, grant relief unconditionally, or grant relief on reasonable conditions. We cannot uphold an unreasonable (and hence erroneous) condition on the ground that we would have affirmed a complete denial of relief. The trial court's grant of relief requires us to

presume that it correctly found the factual and discretionary grounds for relief. We must presume, in short, that in granting relief the court acted lawfully. Only if the grant of relief is itself affirmatively shown to constitute error can we find the imposition of an unreasonable condition was harmless.

A less stringent rule is suggested by *Sheffler v. Hutchings* (1932) 124 Cal.App. 760, 764 [13 P.2d 527], where the court offered the following as an alternative ground for affirming a challenged condition: "[I]f . . . the facts adduced before the trial court were legally sufficient to warrant an unconditional denial of the motions, the question of the reasonableness of the conditions imposed becomes unimportant." We reject this mischievous dictum. It is not enough that the facts below have been "legally sufficient" to warrant a denial. It would have to appear that they were legally *in*sufficient to sustain the action the court actually took, which was to grant relief. An unreasonable condition cannot be sustained on the ground that the defendant was entitled to no relief at all, for if he was entitled to no relief, it would have been error to grant it on *any* terms. (See 8 Witkin, Cal. Procedure, *supra,* Attack on Judgment in Trial Court, § 186, p. 693 ["A court may enter a conditional order relieving a party from default only if the court first finds mistake, inadvertence, surprise, or excusable neglect."]; *Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1747 [33 Cal.Rptr.2d 391].) The above dictum *presumes error* in one part of an order to insulate error in another. We cannot adhere to that approach, which not only offends common sense, but violates the policy of the statute and basic principles of appellate review.

■ While a request for relief under section 473(b) is entrusted "largely" to the trial court's discretion (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 597–598 [153 Cal.Rptr. 423, 591 P.2d 911]), the law strongly favors an exercise of that discretion in favor of granting relief. "With respect to setting aside a default judgment, it is the policy of the law to favor, whenever possible, a hearing on the merits . . . ." (*Orange Empire Nat. Bank v. Kirk* (1968) 259 Cal.App.2d 347, 352 [66 Cal.Rptr. 240]; see *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 255–256 [121 Cal.Rptr.2d 187, 47 P.3d 1056].) "Because the law favors disposing of cases on their merits, 'any doubts in applying section 473 must be resolved in favor of the party seeking relief from default [citations].' " (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980 [35 Cal.Rptr.2d 669, 884 P.2d 126]; see *id.* at pp. 981–982 [" '[W]hen relief under [Code of Civil Procedure] section 473 is available, there is a strong public policy in favor of granting relief and allowing the requesting party his or her day in court.' "].)

The trial court's ruling on such a motion is entitled to the usual appellate deference: Its discretionary determinations will not be reversed in the absence of a clear showing of abuse (*Dingwall v. Anderson* (1969) 271 Cal.App.2d

658, 662 [76 Cal.Rptr. 827]; *Orange Empire Nat. Bank v. Kirk, supra,* 259 Cal.App.2d at p. 352), and factual inferences drawn by it are presumed correct (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [109 Cal.Rptr.2d 256]). Combined with the strong policy favoring resolutions on the merits, this deference produces an especially strong appellate presumption in favor of rulings granting relief: "[A]ppellate courts are much more disposed to affirm an order where the result is to compel a trial on the merits than they are when the judgment by default is allowed to stand and it appears that a substantial defense could be made." (*Orange Empire Nat. Bank v. Kirk, supra,* 259 Cal.App.2d at p. 352; see *Rappleyea v. Campbell, supra,* 8 Cal.4th at p. 980 [" '[A] trial court order denying relief is scrutinized' more carefully than an order permitting trial on the merits' "].)

In order to show that the trial court erred by granting relief—such that its imposition of conditions, however unreasonable, was harmless—respondents would have to overcome this two-barreled presumption favoring a ruling granting a motion for relief. This would require a demonstration that the court abused its discretion even though it ruled in a manner strongly favored by law. Respondents make no real attempt to mount such a showing. They simply reargue the points they made in the trial court. As we shall briefly explain, this showing is wholly inadequate to sustain the proposition they implicitly assert.

### B. *Excuse for Lack of Timely Response*

There can be little doubt that the record shows an adequate justification—indeed, a compelling one—for appellant's failure to file a timely response to the complaint. Her delay in attempting to plead was minimal. The statutory time to plead ran from August 8, 2005, when appellant was served with the complaint, through September 7, 2005. (See Code Civ. Proc., §§ 412.20, subd. (a)(3), (4), 585, subd. (b).) Her default was taken on September 15, 2005, a mere eight days after her statutory time to plead expired. Counsel for respondents had waived default for most of that period by e-mailing Barry Clark on September 8 that "in the event a resolution cannot be reached, a default will be entered on September 15, 2005." This extended the time to plead through the close of business on September 14. Appellant's default was taken the next day—the first day it could have been taken in good faith.

Further, appellant did not wholly neglect her responsibility to plead to the complaint. Rather she attempted to do so, but acted a day—actually a fraction of a day—too late. Her answer was refused by the clerk only because respondents had, hours or minutes earlier, requested and secured the clerk's entry of default. Had appellant's answer beaten plaintiffs' request to the

clerk's desk, the matter would have proceeded to a resolution on the merits and the ancillary litigation from which this appeal arises would never have taken place.

In such a case scarcely any excuse is needed to justify the lifting of a default. Yet here appellant had a compelling excuse in a personal and family tragedy of the highest order—the sudden death of her son. In his September 14 response to the September 8 e-mail from counsel for respondents, Barry Clark wrote, "I would have responded to you a couple days ago, but Pamela's son just died on September 9th, and the funeral and burial arrangements and services have taken all of our time over the past few days." Counsel responded—at 4:55 p.m.—that the latest settlement proposal was unacceptable and that "Mr. Shapiro has instructed me to move forward with the entry of default" in the matter. The clerk's office, of course, closed five minutes later, and the next day saw the race to the courthouse we have already described.

A ruling that these circumstances did not establish excusable neglect would probably be reversed on appeal as an abuse of discretion. (See *A & B Metal Products v. MacArthur Properties, Inc.* (1970) 11 Cal.App.3d 642, 648–649 [89 Cal.Rptr. 873], citing *Bank of Haywards v. Kenyon* (1917) 32 Cal.App. 635, 637 [163 P. 869].) In arguing otherwise respondents cite judicial statements that, applied categorically, would bar relief from default in nearly all cases. Thus they quote *Northridge Financial Corp. v. Hamblin* (1975) 48 Cal.App.3d 819, 824 [122 Cal.Rptr. 109] (*Northridge*), for the statement, "The law is well settled that where a defendant 'with full knowledge of the proceedings . . . fails to take action to protect his interests until after the default, it is an abuse of discretion to set the default aside. [Citations.]' " The critical factor in that case was an implied finding by the trial court that "a deliberate decision was made by defendants not to immediately move to *have the default set aside*. The inference then arose that defendant *might choose not to answer*." (*Id.* at p. 823, italics added.) The first point goes to the question of diligence in seeking relief, not the initial default in pleading. The second point—that the defendant could be found to have elected not to plead—critically distinguishes the case from this one, where there is no basis for a finding that defendant "might choose not to answer." She in fact tried to answer. She failed only because her attempt came a few hours or minutes after her default was entered.

Further, the trial court in *Northridge* had *denied* the motion for relief from default. The appellate presumption of correctness therefore favored that result, and the court's comments on what might constitute an abuse of discretion in the *granting* of relief were pure dictum. Under the principles and standards we have summarized above, categorical statements about what can

be found to constitute excusable neglect—and what cannot—are highly suspect.[1] Because the trial court here *granted* relief, we must indulge all inferences favorable to the finding of cause for relief.

Respondents' arguments find somewhat more traction in *Davis v. Thayer* (1980) 113 Cal.App.3d 892 [170 Cal.Rptr. 328] (*Davis*). The trial court there denied relief on a pure point of law, i.e., the supposed untimeliness of the motion for relief from default. The reviewing court held the motion timely, but nonetheless affirmed on the ground that the evidence before the trial court could not have sustained an order granting relief. We doubt the soundness of this conclusion, at least as it affected the defendant whose codefendant son operated the business that allegedly defrauded the plaintiff. She declared that she had failed to attend to the lawsuit because she was recovering from a heart attack, "taking valium very heavily," caring for her husband who was dying of cancer, and caring for an 86-year-old mother who was herself recovering from surgery. (*Id.* at p. 900.) Moreover her son, on whom she was heavily dependent, had told her he "would take care of the problem." (*Id.* at p. 900.) In declaring this evidence insufficient to support relief from default, the reviewing court seemed to abandon the familiar principles of appellate review as well as general principles of evidence and the specific policies of Code of Civil Procedure section 473: "Although she stated she was under doctor's care for a heart attack and taking medication at the time of service of the papers, she does not state the severity of the condition or in what manner it limited her activity, nor did she present a doctor's declaration to confirm her statements. Was she truly so disabled that she could do *nothing* concerning this matter for nearly six months?" (113 Cal.App.3d at p. 909, original italics.) Of course the test is not whether a defendant is "disabled," let alone utterly helpless, but whether the evidence supports an inference that her neglect in failing to plead is excusable. The fact that the defendant there was under medical treatment, including heavy doses of a well-known sedative, certainly supported such a finding. Worse, by alluding to the absence of professional medical "confirm[ation]" of her averments, the court seemed to betray a judgment about the declarant's *credibility*—a judgment that might be

---

[1] For example, it takes little imagination to posit circumstances in which a defendant might be found to have acted excusably in choosing not to answer. He might believe, mistakenly, that the plaintiff has no intention of executing on the judgment, or that the judgment will be satisfied by a primarily responsible codefendant, or that he himself is judgment-proof and bound for bankruptcy, or that he simply cannot afford to defend himself. Such a decision is obviously imprudent; it might even be reckless. But that only establishes the element of neglect. It does not foreclose a finding of excuse.

appropriate for a finder of fact, but not for a reviewing court passing upon the sufficiency of the evidence to justify *submitting an issue* that no fact finder had ever considered.[2]

Even if we considered the court's approach to this issue sound, it would not follow that the evidence in this record failed to establish excusable neglect. The defendants in *Davis* apparently made no attempt to answer the complaint, or otherwise respond to the litigation, until some six months had passed. Here appellant attempted to file an answer, but missed the window of opportunity by minutes or hours. Nor did she assert her son's death as an excuse for six months of inactivity. At most she asserted it to explain a few days' failure to act. Thus even if we were inclined to espouse the reasoning in *Davis*—which we are not—the same result would not follow here.

Respondents trot out a straw horse by asserting that excusable neglect cannot be found in a showing that "the client was 'busy' and 'forgot' about the lawsuit . . . ." (See *Andrews v. Jacoby* (1919) 39 Cal.App. 382, 383–384 [178 P. 969].) Appellant relies on no such assertion. Further, like most statements, when extracted from context it proves too much by suggesting that relief is unavailable for neglect. In fact the statutes explicitly contemplate relief for neglect, provided the neglect is *excusable*. It is therefore simply wrong to suggest that busyness and lapse of memory cannot justify relief. The question in each case is whether the circumstances, which may include busyness and lapse of memory, make the neglect in issue *excusable*. Here the trial court found that they did. That finding is unimpeachable; indeed a contrary finding would probably be reversible error.

### C. *Delay in Seeking Relief*

Respondents do not separately contend that appellant failed to establish good cause for the 88 days that passed from the entry of default on September 15, 2005, to the filing of her motion for relief on December 12, 2005. It appears without contradiction that Barry Clark first contacted a California attorney on appellant's behalf five days after the default was taken.

---

[2] We find other dubieties in the court's interpretation of the evidence recited by it. Thus the court detected "discrepancies" between the mother's declaration and her proposed answer because in the former she averred that she was a mere employee of her son's venture and had lent no money to the plaintiffs, whereas in the latter "defendants" admitted that a stated sum was " 'owed to the plaintiff.' " (*Davis, supra,* 113 Cal.App.3d at p. 910.) We see no discrepancy between these two statements. Nor can we follow the court's baffling interpretation of the son's averment that had he known the complaint charged fraud, he " 'would have made an effort to prevent the default against [his] mother and [him] . . . .' " (*Ibid.,* ellipsis in original.) The court somehow viewed this as a "statement that she, too, was responsible to plaintiff on the transaction." (*Ibid.*) In our view, the case is not sound authority on what type and quantum of evidence will sustain relief under section 473(b).

While discussing terms with Attorney Bedolla, appellant and Barry Clark moved their place of residence. They engaged Bedolla's services at the end of October. About a week's delay in formalizing this engagement was attributable to difficulties in gaining access to the court file. Bedolla declared that ensuing delays were the result of demands on his practice, in particular some "serious legal problems" that "threatened to put" Bedolla's "biggest and most important" client out of business. We cannot say that this is an insufficient showing of excuse for not filing the motion for relief sooner. Since respondents do not distinctly address the point, we shall not further consider it.

### D. *Meritorious Defense*

 Respondents contend that appellant "has no meritorious defense." They cite *Smith v. Busniewski* (1952) 115 Cal.App.2d 124, 129–130 [251 P.2d 697], for the proposition that "whether defendant proceeds by noticed motion in the main action or independent lawsuit to set aside the judgment, he must show a meritorious defense." We presume that the cited case is still good law insofar as it holds that in a *separate action in equity* brought to set aside a prior judgment, the plaintiff must "*plead* and *prove* that the result in the main action would have been different had the mistake not occurred [citations], since equity will not grant relief to a party who claims only the barren right of being permitted to defend against a claim to which he has no defense. [Citations.]" (*Id.* at p. 128.) Courts once imposed a similar requirement on statutory motions to set aside default, but in 1981, after decades of criticism, the Legislature abrogated any such requirement by explicitly declaring, "No affidavit or declaration of merits shall be required of the moving party." (§ 473(b); Stats. 1981, ch. 122, § 2, p. 862.) Accordingly, respondents' legal premise—that appellant must affirmatively demonstrate a "meritorious defense"—is incorrect. (See 8 Witkin, Cal. Procedure, *supra,* Attack on Judgment in Trial Court, § 184, pp. 691–692; *Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 786–789 [59 Cal.Rptr.2d 332].)

Appellant has *asserted* a meritorious defense by denying respondents' allegation, among others, that the transfers they seek to avoid were made in fraud of creditors. She also denies involvement in any fraud or deceit practiced on respondents. Even when courts required an affirmative demonstration of merit it was held to mean only that the movant must show " 'that he has a meritorious case or defense, so that a different result *may possibly* be reached if the judgment or order is vacated.' " (*H. A. Pulaski, Inc. v. Abbey Contractor Specialties, Inc.* (1969) 268 Cal.App.2d 883, 887 [74 Cal.Rptr. 590], italics added; see *id.* at p. 890.) Thus "it was early held that a hearing on a motion to relieve a defendant from default is not the place or time to ascertain whether defendant really has a defense." (*First Small Business Inv. Co. v. Sistim, Inc.* (1970) 12 Cal.App.3d 645, 650 [90 Cal.Rptr. 798].) This is

precisely what respondents would have us do. The questions put in issue by appellant are intensely fact based. Respondents cannot impeach the trial court's decision to grant relief merely by arguing that they will prevail on the merits.

The trial court did not err by ruling that appellant was entitled to relief from the default and default judgment entered against her.

## III. *Conditions on Relief*

### A. *Background*

We come to the heart of the appeal, which is appellant's challenge to the portion of the order that conditioned relief on her posting a bond for $1.8 million. To place this ruling in context we must examine in greater detail the proceedings culminating in the order under review.

Early in the hearing on the motion for relief from default, the court announced that it was "cutting to the chase" by saying, "there should be some protection here. . . . [A]bout the only way I would grant the relief you're seeking is conditioned on a bond." Later the court indicated that it indeed found good cause for relief, but was concerned about the risk that vacating the judgment would permit appellant and Clark to avoid collection: "[O]ther than all the red flags that are flying all over this thing, the likelihood is I would grant her relief. There is a bunch of stuff that went on. The death of her son. Being in Florida. . . . [T]here is some interruption in communication and all of that stuff." Yet the court was concerned that "if I grant the relief you're seeking, I'm doing a huge disservice to the plaintiff because I think the plaintiff is going to be hung out to dry . . . ." The court later commented on the apparent magnificence of the house appellant and Clark were constructing in Florida, and then observed that based on respondent Shapiro's declaration, he "got screwed."

Counsel for appellant conceded the justice of the court's comments as to the sums actually lent by respondents and the costs of recovery, which were estimated at the hearing as $400,000. "We don't disagree he should get his money back and what he paid to basically prosecute. A 1.4 million windfall on a default basis, that is too much. That is not what is right and fair." The court then said it was going to continue the matter for 30 days, "because maybe Shapiro can be protected by a smaller bond." It ordered counsel to "confer on this thing to see if there is some way to resolve this. You know where my thought process is leading." Counsel for appellant replied, "Your Honor, I don't disagree with that notion. I fully understand it."

Later that day counsel for respondents wrote to counsel for appellant proposing that the parties stipulate to a bond for $530,000. Four days later,

respondents applied to shorten time on the continued hearing because of evidence that construction on the Florida house might be completed, and a homestead exemption perfected, before the continued hearing date. The court granted the application. The day before the rescheduled hearing date, counsel for respondents filed a supplemental opposition asserting in effect that appellant was not an "innocent spouse," as her counsel had suggested at the first hearing, because she was personally involved in the operation of Barry Clark's business and in various matters surrounding the sham development projects in which respondents were induced to invest. Respondents' counsel also argued that the statutory criteria for undertakings in a fraudulent transfer case would suggest a bond in the amount of $1,060,000. (See Civ. Code, §§ 3447, 3448.)[3]

Clark filed a declaration stating that he and appellant were "willing to have recorded on the [Florida] property . . . a Deed in favor of Plaintiff in the sum of $350,000 to secure the court granting an order except the Deed would be recorded after the new construction loan is funded and would be expunged if judgment is ultimately granted in favor of Pamela in this action." He further declared, "Pamela and I cannot obtain a bond in any substantial amount at this time. The only possible source of security for a bond will be the Property. The Property without the home completed has little if any equity. Since the home on the Property is what is driving the potential value of the Property, until the home is finished the Property is very speculative. . . . Any substantial bond on the property will make it impossible to get the construction financing to finish the home."

At the continued hearing, counsel for appellant asserted that the arrangement proposed by him was necessary to secure financing to complete the home and prevent its falling into "waste." Counsel for respondents replied that there was no evidence of any attempt to secure new financing and that the real reason for paying off the original construction loan was to permit appellant and Barry Clark to "convey this property freely and further stymie my client's collection efforts." Counsel for appellant stated, "The purpose of the bond would be to secure as to Pamela only, the amount that she might be

---

[3] These statutes, which supplement the Uniform Fraudulent Transfer Act (Civ. Code, §§ 3439–3439.12), permit the recipient of property allegedly transferred in fraud of creditors to post an undertaking in order to free the property from the cloud arising from an action to avoid the transfer. (See Civ. Code, § 3439.07, subd. (a)(1).) This enables the recipient to dispose of the property by ensuring the plaintiff's ability to collect on any judgment he may recover. (See 8 Witkin, *supra*, Enforcement of Judgment, § 473, pp. 471–472.) The amount of security must equal twice the value of the property or twice the creditor's claim, whichever is less. (Civ. Code, § 3448.) This liberal formula presumably reflects the fact that the security is not *imposed on* the transferee but voluntarily *assumed by* him. He remains free to forego any posting of security by simply holding the property pending the outcome of the suit. He will choose to post security only if there is some inducement outweighing the cost of the undertaking—most obviously, a need or desire to transfer the property to a third person.

held liable for. The initial judgment is for 290 base. . . . [T]he plaintiff is here to basically have the court bond or try to secure the punitives against Pamela which haven't been proved. [¶] We don't—we understand the wisdom of securing at least the base amount of the investment plus reasonable interest on that."

The court declared, "I can conclude based on this set of facts one of two things. She's a part [and] parcel of it or she's completely innocent. Based on all of what I have reviewed, I am hard put to conclude that she has no clue as to what's going on. So for the sake of what is happening here and I believe that the potential for a huge miss in justice [*sic*; presumably, "injustice"] would occur, I'm going to grant the relief that he has asked for. I will grant the motion to set aside the default, but it's going to be conditioned on posting of a bond as requested by the plaintiff or the other parties regarding transferring, conveying, whatever." Appellant's counsel inquired into the amount of the bond, noting that respondents were asking for "one million dollars which is . . . more than there is assets in the property." The court suggested that if appellant and Barry Clark could pay off a $1 million loan, as they just had, they could post security in like amount. Counsel disagreed, reiterating that the house was "currently under construction." The court replied, "Then they're going to have to figure out something or the default is not going to be set aside. Me thinks for the prospect of still bedragglery is very high here." (*Sic*; presumably, "Methinks the prospect of skullduggery is very high here.")

As the hearing concluded the court appeared to be contemplating a bond in the amount most recently suggested by respondents, which was $1,060,000. Thus the court referred to "one million dollars." When the matter was submitted, counsel for respondents apparently presented a form of order with a blank space for the amount of the bond. In the order as executed and entered, the court conditioned relief on appellant's "post[ing] a bond in the sum of $1,800,000.00." This sum corresponds roughly to the amount of the default judgment, i.e., $1,871,183.47, consisting of $298,558.37 in compensatory damages, $72,147.60 in interest, $477.50 in costs, and $1.5 million in punitive damages.

B. *General Principles*

■ The statute authorizes the court to grant relief "upon any terms as may be just." (§ 473(b).) This has been held to limit the conditions thus imposed to those " 'reasonably proportionate to the other party's prejudice or expense.' " (8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, § 187, p. 693, quoting *Kirkwood v. Superior Court* (1967) 253 Cal.App.2d 198, 201 [61 Cal.Rptr. 316] (*Kirkwood*).) Strictly speaking this

would suggest that conditions may only redress *costs incurred as a result of the default.* However, courts have "occasionally upheld" the "more burdensome condition" of "a deposit of money or a bond to protect the plaintiff in the event of eventual recovery." (8 Witkin, *supra*, Attack on Judgment in Trial Court, § 186, p. 693, citing *Airline Transport Carriers v. Batchelor* (1951) 102 Cal.App.2d 241, 242 [227 P.2d 480]; *Goodson v. The Bogerts, Inc.* (1967) 252 Cal.App.2d 32, 42 [60 Cal.Rptr. 146] (*Goodson*).)

Such a condition is not beyond the court's power, or "unreasonable or unjust per se." (*Goodson, supra*, 252 Cal.App.2d at p. 42.) In general, the question of its appropriateness is vested in the discretion of the trial court, whose determination will not readily be disturbed on appeal. (*Kirkwood, supra*, 253 Cal.App.2d at p. 201.) However, such a condition will be stricken as "arbitrary and an abuse of discretion" if the burden it imposes upon the defendant is wholly out of proportion to the burden imposed on the plaintiff by the default and its vacation. (*Id.* at p. 202.) In the consideration or review of such a condition, "[e]ach case must be determined upon its own peculiar facts and circumstances." (*Goodson, supra*, 252 Cal.App.2d at pp. 42–43.)

C. *Discussion*

We find no abuse of discretion in the order insofar as it conditioned relief on the furnishing of security for a potential award of *compensatory* damages. If appellant had any particular objection to such a condition, it was not voiced below, even though respondents clearly and repeatedly sought such a condition, and the court made it the central issue at the two hearings on appellant's motion for relief from default. Indeed, counsel for appellant all but invited the court to impose such a condition, saying that he did not "disagree with th[e] notion" of trying to arrive at an appropriate amount for security and that "we understand the wisdom of securing at least the base amount of the investment plus reasonable interest on that."

Even on appeal, appellant offers no cogent objection to a condition requiring security for the eventual satisfaction of an award of compensatory damages. The trial court was entitled to find on the facts before it that Barry Clark had obtained funds from respondents by false pretenses and his abuse of a position of trust, and had promptly transferred those funds to a Florida builder in order to incorporate their value in a residential homestead in his and appellant's names, in which form they would eventually be shielded by Florida's liberal homestead laws from respondents' collection efforts. More succinctly, the court was entitled to find a substantial danger that granting unconditional relief from the existing judgment would facilitate an attempt to snatch respondents' money right from under the court's nose. The danger was not only that respondents might be denied an effective remedy but that the

court itself might be disgraced by becoming a tool for fraud and imposition. We therefore have no difficulty in sustaining the requirement of security for the compensatory damages respondents were conceded to have sustained—conceded, that is, at least by appellant's spouse and cobeneficiary of any homestead.

We have concluded, however, that the trial court committed an abuse of discretion, if not an error of law, when it included punitive damages in the amount to be secured. The sum required by it exceeds by nearly $1.3 million the highest figure for compensatory damages respondents ever managed to articulate. That figure appears in counsel's letter proposing a stipulated bond of $530,000, which was said to consist of "the principal sum of $300,000, plus both past and future interest of $104,822, costs and attorney's fees of $125,000 . . . ." Indeed it exceeds by almost $800,000 the highest amount cogently requested by respondents, which was double the foregoing sum. We can think of no conceivable basis for the court's requiring a bond in an amount larger than was requested by the party benefiting from it.

■ Further, we see no legal or logical justification, at least in this case, for conditioning relief from default on the furnishing of security for a prospective award of punitive damages. A punitive damages award is "essentially a windfall for plaintiffs that the law permits for public policy reasons." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 812 [16 Cal.Rptr.3d 374, 94 P.3d 513]; see *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 712 [34 Cal.Rptr.2d 898, 882 P.2d 894], quoting *Adams v. Murakami* (1991) 54 Cal.3d 105, 120 [284 Cal.Rptr. 318, 813 P.2d 1348] ["Because compensatory damages are designed to make the plaintiff 'whole,' punitive damages are a 'windfall' form of recovery."]; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 981 [105 Cal.Rptr.2d 88], quoting *In re Related Asbestos Cases* (N.D.Cal. 1983) 566 F.Supp. 818, 822 [" 'Punitive damages are not a part of a plaintiff's remedies for harm suffered . . . . If a plaintiff is unable to recover punitive damages, he will not suffer unrectified injury.' "].) The rationale for requiring a bond as a condition for relief from default is "to protect the plaintiff in the event of eventual recovery." (8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, § 186, p. 693.) Any such condition must be "reasonably proportionate to the other party's prejudice or expense." (*Kirkwood, supra*, 253 Cal.App.2d at p. 201.)

We question whether a bond protecting only a plaintiff's interest in a "windfall" can ever constitute a reasonable condition under section 473(b). We have found no case in which such a condition was imposed, let alone upheld on appeal. Nor do we detect any circumstance in this case that might justify such a condition. Appellant may have possessed, as respondents insist, such intimate knowledge of the operations of Barry Clark's business that she

was aware of the frauds allegedly perpetrated on respondents. She may thus have possessed a mental state sufficiently blameworthy to justify an award of punitive damages. But these possibilities have not been put to the test of the adversary process, and the record hardly justifies an assumption that they would ultimately be found true. The essential function of the law is to strike a balance between competing interests and policies. As against the policy strongly favoring adjudication on the merits, and appellant's interest in securing such an adjudication, respondents' interest in securing the payment of a windfall, and the policy of punishing wrongdoers through civil actions in tort, lack sufficient weight to sustain the order under review. We conclude that insofar as the amount of the bond exceeded an amount reasonably anticipated to make plaintiff whole, its imposition as a condition of relief was an abuse of discretion. This makes it unnecessary to consider the many other objections raised by appellant to the condition.

## IV. *Appellate Remedy*

We have concluded that the order granting relief from default is erroneous insofar as it conditions relief on the posting of an amount exceeding the compensatory damages reasonably anticipated to be recovered in the event respondents prevail on the merits. The simplest disposition would be to remand the matter to the trial court for a redetermination of the sum to be secured. We are concerned, however, that this approach would produce still further delay in this matter by producing another appeal. In the interest of judicial economy, we will set the amount of security at $400,000, which is a sum well over the amount of which respondents claim to have been defrauded, and one appellant's counsel appeared to concede below as a reasonable estimate of compensatory damages. We recognize that additional prejudgment interest will have accrued while this appeal was pending, but since the appeal was substantially meritorious we decline to increase on this account the sum secured. We also note that while respondents apparently did not ask the court to adopt the grossly excessive figure set forth in the order, they did ask for an amount twice what they themselves predicted for a compensatory award. It is this overreaching, as compounded by the court's seemingly sua sponte augmentation of the amount requested, that has lent merit to the present appeal.

### Disposition

The order granting relief from default is modified to provide that the default will be lifted and the default judgment vacated upon (1) appellant's posting, within 30 days after this decision becomes final as to this court, an undertaking in the sum of $400,000 securing respondents' recovery in this

matter; and (2) appellant's payment to respondents of attorney fees as directed in the order under review. As so modified the order on relief from default is affirmed.

The appeal from the default judgment is dismissed.

Each side will bear its own costs on appeal.

Premo, J., and Elia, J., concurred.