Filed 5/28/25  Frontline Medical Associates v. Bird, Marella, Boxer, etc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| FRONTLINE MEDICAL ASSOCIATES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, PC, et al., <br><br> Defendants and Respondents. | B336038 <br><br> (Los Angeles County Super. Ct. No. 19STCV26512) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Theresa M. Traber, Judge.  Affirmed.

Law Offices of George A. Shohet, George A. Shohet, and Katja M. Grosch for Plaintiff and Appellant.

Larson, Hilary Potashner, and John S. Lee for Defendants and Respondents.

_____

In the proceedings below, the trial court granted a motion for terminating sanctions filed by respondents Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C. and Benjamin Gluck (a partner in the Bird Marella firm) against appellant Frontline Medical Associates, Inc., and dismissed Frontline's case with prejudice. The trial court found Frontline intentionally made various misrepresentations to the court on whether its former attorney David Browne had a conflict of interest that required his withdrawal, on the identity of the owner of Frontline, and on whether its former (and perhaps current) owner and principal, Munir Uwaydah, was able or willing to return to Los Angeles from his current residence in Lebanon. The court also found Frontline demonstrated a pattern of willful noncompliance to its discovery obligations and in response to court orders.

Frontline appeals from the resulting judgment, arguing the court erred in granting respondents' motion. We hold that substantial evidence supports the court's misconduct findings and that the court did not abuse its discretion in dismissing Frontline's case. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In July 2019, Frontline filed a complaint, which it amended in December 2021. The first amended complaint alleged respondents made misrepresentations to Frontline to induce it to pay them $2,250,000 for legal services to be provided to Paul

---

[1] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

Turley.[2]  Frontline alleged also that respondents—who had also represented Frontline and Munir Uwaydah[3]—failed to adequately advise Frontline about the potential conflicts of interest that could arise from their simultaneous representation of Turley.  Frontline alleged causes of action for breach of fiduciary duty, fraud by intentional misrepresentation, fraud by fiduciary, conversion, common counts, and declaratory relief. Respondents answered in March 2022.

Because the bases for respondents' ultimately successful motion to compel span actions and representations over several years, such that a chronological timeline would be more confusing than elucidating, we have organized the following sections by subject matter.

### A.  *Facts Relating to Attorney Browne's Misrepresentations About His Conflict of Interest*

#### 1.  Browne Declares He Must Withdraw as Counsel Due to a Potentially Unwaivable Conflict

In an April 27, 2023 hearing regarding Frontline's failure to provide deposition dates for certain witnesses, the court set an

---

[2] According to the first amended complaint, Turley operated Frontline before September 2015.

[3] While the first amended complaint did not allege Uwaydah's relationship to Frontline, Frontline states on appeal that Uwaydah was its "former principal."  In a September 4, 2021 response to an interrogatory asking Frontline to identify "all of the owners of FRONTLINE," Frontline responded "Munir Uwaydah."

order to show cause regarding further sanctions for May 8, 2023. On May 4, 2023, Attorney Browne submitted a declaration in response to the OSC attesting that "On Monday[,] April 24, 2023, I was served with an order to show cause re contempt that is scheduled for trial on May 8, 2023 . . . . The allegations seek a contempt charge as to me personally as well as other defendants. The allegations of contempt arise from conduct by Medconsult, S.A.L, who is the current owner of plaintiff herein." Browne declared the contempt proceeding "creates a conflict of interest that may or may not be waivable depending on the entirety of the factual circumstances," but stated his own belief that "until the contempt matter is resolved in my favor, I cannot act as counsel for the plaintiff herein on this or any other matters involving plaintiff or its owners. There are too many conflict problems that undermine my ability to act as counsel for plaintiff herein."[4]

Browne declared he could not provide deposition dates or make arrangements for depositions as Frontline had been ordered (discussed *post*) because of the pending order to show cause proceeding. Browne stated he was "exploring whether or not there was a way to continue despite that [contempt] proceeding, and consulting with counsel that I have retained. My recent conclusion was that I could not ethically continue to act as counsel [for Frontline] subject to this problem. It affects

---

[4] In a later declaration, Browne explained that Medconsult "had transferred title to real property in violation of a court order prohibiting transfer" and that he (Browne) "had nothing to do with that act and was hired afterwards concerning civil litigation brought by another party concerning that transfer." Browne claimed the OSC re contempt against him was "based on litigation activity that I undertook in that civil case."

4

everything that I try to do, as well as my ability to communicate with my clients and make arrangements with them about this matter."

At the May 8, 2023 OSC hearing before the trial court, Browne informed the court that he had advised Frontline of the conflict and advised it to obtain new counsel as soon as possible. The court continued the hearing for a week, finding it unfair to make a ruling regarding further sanctions when Frontline was "immobilized" due to Browne's inability to represent Frontline and speak on its behalf. That same day, the deputy district attorneys moved to amend the contempt citation, which resulted in a continuance of the contempt proceeding to July 14, 2023.

On May 15, 2023, attorney Brian McMahon appeared as counsel for Frontline. McMahon represented he would provide dates for depositions as ordered. The trial court indicated that after the deposition dates were set, the parties would have a better sense of when they would be prepared to conduct the bench trial (which had been previously ordered) to determine whether Frontline was Uwaydah's alter ego (discussed *post*).

### 2. Browne Opines the Conflict Is Unwaivable

On June 15, 2023, Frontline filed an ex parte application asking the court to issue a ruling on a request for protective order (discussed *post*). Accompanying this motion was a June 13, 2023 declaration from Attorney Browne stating that, due to the continuing contempt matter, Browne "had to withdraw as it created a mandatory conflict with [his] client that could not be waived."

On June 27, 2023, attorney George Shohet appeared as "potential counsel" for Frontline. Shohet explained to the court that he would "likely be able to represent Frontline once we clear

5

something that's pending in the criminal court before Judge Fidler." Shohet elaborated that he was "in a similar position to Mr. Brown[e] in that once I step[ped] in to assist the entities that are involved as third parties in the criminal case, the Los Angeles District Attorney's Office determined that I should be charged with civil contempt for writing a letter in defense of several lawsuits brought by an adverse party against one of the entities." Shohet expressed optimism that he could "clear this," but added that even if a conflict remained, it was waivable. He clarified the entity that he represented (which resulted in the contempt charge) was Medconsult, the purported owner of Frontline.

### 3. Despite the Unwaivable Conflict and Subsequent Withdrawal, Browne Continues to Act as Frontline's Lawyer

At the July 12, 2023 deposition of Amber Woodley as Frontline's Person Most Qualified (PMQ), Woodley (who was represented at the deposition by Attorney Shohet) was asked how she prepared for the deposition. Woodley testified she met with Attorney Browne several times, "once or twice" four weeks ago, and again the week after that.

On July 18, 2023, at the bench trial to determine whether Frontline was Uwaydah's alter ego, respondents examined Paul Turley regarding a December 3, 2018 document he signed under penalty of perjury as part of his plea agreement. Turley testified that, at the time he signed, he believed the statements within the document were true but that, "over the last several months" he was "supplied with certain statements and information" by Attorney Browne that led him to believe that some of the statements were not true. When asked about his discussions with Browne, Turley testified he had spoken with him "possibly

6

four or five times on the phone and [had] maybe . . . two sessions with him in person." Turley added that the in-person sessions were at Browne's office, and the last meeting took place two days prior and lasted for five hours. Turley testified that his wife—also listed as a witness—accompanied him to meet Browne in the latest session and met with him first.

## B. *Facts Relating to Discovery*

### 1. First Set of Form and Special Interrogatories; Second Set of Requests for Production of Documents

On March 22, 2021, respondents served their first set of form and special interrogatories and their second set of requests for production of documents. After respondents granted extensions, Frontline's responses were due by May 21, 2021. No responses were received. On June 2, 2021, respondents sent a meet-and-confer letter, which went unanswered.

On September 10, 2021, respondents filed a motion to compel responses to special interrogatories, contending Frontline had failed to respond. Later that same day, Frontline served responses to those interrogatories. On September 14, 2021, respondents filed a motion to compel responses to requests for production of documents, again contending Frontline had failed to respond.

On October 6, 2021, the court denied respondents' motion to compel special interrogatories as moot and denied its request for sanctions. The court ordered Frontline to provide code-complying responses to the requests for production of documents without objection within 20 days. After respondents sent a meet-and-confer letter on November 4, 2021 decrying the lack of

responses, Frontline served responses to the requests for production on November 14, 2021.

On October 8, 2021, respondents served a notice of informal discovery conference, set for December 16, 2021. On October 20, 2021, respondents sent a meet-and-confer letter regarding Frontline's discovery responses; Frontline did not respond to the letter.

On November 12, 2021, and then again on November 16, 18, and 19, respondents asked Frontline for an extension on their deadline to file a motion to compel, given the upcoming December 16, 2021 informal discovery conference. Frontline never responded.

On November 23, 2021, respondents filed a motion to compel further responses to form interrogatories and special interrogatories. As to form interrogatories, respondents argued Frontline "failed and refused to provide complete and non-evasive responses to" Form Interrogatory No. 17.1(d), which asked Frontline to identify documents supporting its denial of 16 requests for admission. As to special interrogatories, respondents argued Frontline "failed and refused to provide complete responses to the subject discovery."

On December 16, 2021, the parties attended an informal discovery conference where Frontline "promised to supplement its interrogatory responses to be code-compliant by the staggered dates of December 23, 2021 and January 7, 2022." It also promised to supplement its responses to requests for production of documents to include responses identifying the documents with the specific request number to which the documents respond. Frontline did not provide responses by the agreed upon dates and

8

ignored respondents' requests for an update made on January 4, 7, 12, and 13, 2022.

On January 21, 2022, the court ordered Frontline to serve supplemental responses by February 10, 2022, and continued the motion to compel hearings to February 16, 2022. The court denied respondents' requests for monetary sanctions but "admonished [Browne] to respond to defendant's counsel's emails."

Frontline did not serve supplemental responses. At the continued February 16, 2022 hearing, Frontline stated it would comply with the court's January 21, 2022 hearing in five days. As of March 4, 2022, Frontline had not complied, and respondents filed their first motion for terminating sanctions (discussed *post*).

### 2. Second Set of Form Interrogatories, Special Interrogatories, Requests for Admission, and Requests for Production of Documents

On May 20, 2022, respondents served a second set of form interrogatories, special interrogatories, and requests for admission, and a supplemental request for production of documents. When Frontline did not respond, respondents sent a meet-and-confer e-mail on June 27, 2022. After receiving no response, respondents moved to compel on July 15, 2022, asking the court to compel Frontline to respond to the discovery requests without objection.

On August 15, 2022, the court granted respondents' motion as to form interrogatories, special interrogatories, and the supplemental request for production of documents, but denied the motion as to the requests for admission, finding there was no

9

statutory basis to compel an initial response to this form of discovery, as opposed to deeming the requests admitted.[5] The court ordered Frontline to serve "code-compliant responses without objection by August 29, 2022." It again denied respondents' request for monetary sanctions.

### 3. Third Set of Special Interrogatories and Requests for Production of Documents

On August 16, 2022, respondents served a third set of special interrogatories and a third set of requests for production of documents. After receiving no responses, respondents sent a meet-and-confer e-mail on September 20, 2022. Browne responded the next day, stating he should be able to finalize the responses that day. Respondents never received the promised responses.

On October 18, 2022, respondents moved to compel responses to its third set of special interrogatories and third set of requests for production. On November 14, 2022, the court granted the motions. Frontline was ordered to serve code-compliant discovery responses within 14 days of the issuance of the minute order. The court also imposed monetary sanctions of $3,000 and ordered Frontline to "comply with all applicable deadlines in this action going forward."

---

[5] The court noted that Frontline filed an untimely opposition that the court refused to consider. The court referenced a previous July 26, 2022 minute order—not in the record—in which "the Court stated that its patience with Plaintiff and Plaintiff's counsel's adamant refusal to comply with the Code of Civil Procedure, the California Rules of Court, and with this Court's binding orders was exhausted."

10

### 4. Depositions

#### (a) Frontline's PMQ

##### (i) The First Deposition

On March 15, 2022, respondents served a notice of deposition for Frontline's PMQ, setting the deposition for March 25, 2022. Although the notice was served both personally and electronically, Frontline served no objections. However, Frontline failed to appear at the deposition.

On April 14, 2022, Attorney Browne filed a declaration claiming that, due to COVID-19, he was "largely not in [his] office," but had instituted procedures to keep him informed. However, those procedures "fell apart starting in late 2021," causing Browne to unintentionally "miss many communications" that he thought were being addressed. Browne also explained difficulties he had in communicating with Frontline's representatives, who were in Lebanon, and a crucial witness (Janek Hunt) who was incarcerated in Riverside County, and to whom he was unable to speak. Browne claimed he had been unaware of the March 25, 2022 deposition.

##### (ii) The Second Deposition

In June 2022, the parties submitted a "Joint Status Report" informing the court of various issues that had a bearing on the then-scheduled July 2022 trial date. Among the issues identified was that Frontline intended its PMQ to be Janek Hunt, who had returned to Estonia and needed a visa to enter the United States. Frontline subsequently informed respondents that Hunt's visa was denied.

11

On August 19, 2022, respondents advised Frontline that, due to Hunt's conviction and imprisonment for fraud, they believed Hunt was "categorically ineligible for reentry into the United States." Four days later, Browne informed respondents' counsel that Hunt "had an interview with the officer who will make the decision concerning his visa," and Browne's understanding was that "they are inclined to grant it once they receive additional information, including a letter from me concerning the purpose and necessity of the deposition in Los Angeles. I further understand that the process of finishing the visa process should proceed quickly, and Mr. Hunt available in Los Angeles in a month." Respondents' counsel responded with skepticism, asking Browne to send "all documents related to Mr. Hunt's current visa application, including any that show a likelihood of approval and the letter you are submitting on Mr. Hunt's behalf." Browne refused.

On August 29, 2022, respondents noticed the deposition of Frontline's PMQ for the second time, setting the deposition date for one month later, on September 29, 2022. Frontline served no objections but did not appear.

On October 4, 2022, Attorney Browne offered to produce "someone with no percipient knowledge who has just been briefed on the subjects," but cautioned he "would not agree to repeated depositions in which we go through rounds of lack of knowledge, and then further briefing, and then further questioning." Respondents stated it wanted a witness whose testimony was "compliant with California law" and asked Browne to provide a date in the week of October 17, 2022 for a re-noticed deposition. Respondents received no response.

12

On October 14, 2022, respondents moved to compel the deposition of Frontline's PMQ. On November 14, 2022, the court granted respondents' motion, ordering Frontline to produce its PMQ for deposition in Los Angeles within 14 days of the issuance of the minute order. The court also imposed monetary sanctions of $3,000 and ordered Frontline to "comply with all applicable deadlines in this action going forward."

### (iii) The Third Deposition

On November 28, 2022, respondents deposed David Livingston as Frontline's PMQ. On December 13, 2022, respondents moved for terminating sanctions based on this deposition, arguing that Livingston "is not currently an officer, director, managing agent, employee, or agent of Frontline," "was selected as the PMQ eight days before the deposition," "was never an employee of Frontline," and "did not even speak with any purported officers, directors, managing agents, employees, or agents of Frontline in preparation for the deposition." Respondents claimed the designated PMQ was "a wholly unqualified witness who answered a variant of 'I don't know' over 500 times on essentially all of the core issues in this case." Respondents submitted a 41-page separate statement outlining the topics and questions to which the deponent lacked knowledge.

On March 8, 2023, the court denied respondents' motion but ordered Frontline "to either make its person most qualified available for a subsequent deposition of up to seven hours at a time and place of Defendants' election, after complying with the Court's preparation requirements described herein" or, at respondents' "sole election, make Munir Uwaydah and/or Janek Hunt available for remote deposition at a time of Defendants' choosing."

13

### (iv)   The Fourth Deposition

On April 19, 2023, respondents' counsel sent an e-mail to Attorney Browne, memorializing a conversation in which he agreed to provide "proposed dates tomorrow for the depositions of . . . Frontline's PMQ."  Browne did not provide any dates, and ignored follow-up e-mails sent on April 20, 21, and 24, 2023.

On April 26, 2023, respondents moved on an ex parte basis to compel compliance with the court's March 8, 2023 order and the parties' agreements regarding depositions, stating Frontline had failed to provide respondents with a deposition date for the PMQ deposition.

On April 27, 2023, the court granted respondents' ex parte application, ordering Frontline to "provide deposition dates by NOON on May 1, 2023 for . . . Plaintiff's PMQ . . . .  The deposition date[] shall be on or before May 15, 2023."  The court warned:  "If Plaintiff fails to comply with the May 1, 2023 deadline to provide deposition dates, nonmonetary sanctions will be imposed to preclude Plaintiff at trial from offering documents or testimony at trial inconsistent with or beyond the scope of the responses provided by David Livingston at the November 28, 2022 deposition of Plaintiff's PMQ."  The court set an order to show cause re: further sanctions for May 8, 2023.

As discussed above, on May 8, 2023, the court accepted Attorney Browne's claim that he had a conflict and needed to withdraw from representing Frontline, rendering him unable to provide any deposition dates.  On May 15, 2023, the court ordered Frontline's new counsel to provide deposition schedules "by no later than the close of business on MAY 16, 2023."  The court further ordered the depositions to take place by May 31, 2023.

14

On July 12, 2023, respondents deposed Amber Woodley as the PMQ of Frontline.[6] Woodley and her counsel arrived to the deposition at 2:17 p.m.— 47 minutes late.[7] At 3:55 p.m., the deponent's counsel requested and received a break; testimony resumed at 4:23 p.m. Woodley's counsel then informed respondents' counsel that Woodley needed to leave at 5:00 p.m. The deposition was suspended shortly after 5:00 p.m.

### (b)    Other Depositions

On April 19, 2023, respondents' counsel sent an e-mail to Browne memorializing a conversation in which Browne agreed to provide proposed deposition dates for Janek Hunt, Adib Kassir, Mazen Helou, Ali Mohsen, and Medconsult's PMQ.[8] Browne did not respond to that e-mail, nor did he respond to follow-up e-mails sent on April 20, 21, or 24, 2023.

On April 26, 2023, respondents moved on an ex parte basis to compel compliance with the court's March 8, 2023 order and the parties' agreements regarding depositions, stating Frontline had failed to provide respondents with a deposition date for Hunt, Kassir (individually and as Medconsult's PMQ), Helou, and Mohsen.

---

[6] Woodley's deposition was originally noticed for June 13, 2023, but on June 12, Frontline's counsel informed respondents' counsel that Woodley had tested positive for COVID.

[7] Respondents' counsel declared that the deposition was originally scheduled for 10:00 a.m. that morning but, two days before the deposition, Frontline's counsel asked for the deposition time to begin at 1:30 p.m.

[8] In a filing with the court, respondents contended Kassir was Medconsult's PMQ.

15

On April 27, 2023, the court granted respondents' ex parte application, ordering Frontline to "provide deposition dates by NOON on May 1, 2023 for the following witnesses: . . . (ii) Adib Kassir (individually and as the PMQ of Plaintiff s alleged owner Medconsult); (iii) Mazen Helou; (iv) Ali Mohsen; and (v) Janek Hunt. The deposition dates shall be on or before May 15, 2023."

On May 15, 2023, the court ordered Frontline's new counsel to provide deposition schedules "by no later than the close of business on MAY 16, 2023." The court further ordered the depositions to take place by May 31, 2023.

On May 23, 2023, the court again ordered Frontline to provide a deposition date for Mohsen "as soon as possible."

Kassir was deposed remotely on June 5, June 12, and July 5, 2023. On June 5, Kassir arrived at 8:13 a.m. for an 8:00 a.m. deposition and informed respondents' counsel that the deposition needed to end by 10:00 a.m. because of Lebanon's unstable electricity situation. Respondents characterized the June 5 deposition as consisting mostly of excessive breaks, non-responsive answers, and refusals to answer.[9] On June 12, respondents obtained only 30 pages of testimony. On July 5, 2023, respondents claimed Kassir's deposition lasted a little over four hours, including 54 minutes of breaks. Twice, Kassir "clarified" earlier answers after these breaks. Kassir also refused to answer several questions. Kassir ended the deposition after four hours, claiming he was tired.

---

[9] For example, Kassir took 18 minutes to answer what documents he had reviewed in preparation for the deposition, and did not even provide a complete answer before asking for a restroom and cigarette break.

Hunt was deposed remotely on June 9, 2023.[10] Respondents claimed they "require[d] three separate sessions [for the deposition] due to the witness's abrupt refusals to continue to completion."[11]

Frontline never provided deposition dates for Mohsen or Helou.

### C.     *Facts Relating to Alleged Misrepresentations Regarding Frontline's Ownership*

On November 29, 2022, respondents made a motion in limine to dismiss the case or, alternatively, preclude Frontline from introducing evidence unless Uwaydah appeared at trial. In opposing that motion, Frontline filed a December 6, 2022 declaration of Uwaydah. Therein, he explained Medconsult was a Lebanese company with which he had done business, and who had obtained a "large judgment" against him in 2004. Uwaydah stated that, as part of his efforts to "resolve this obligation," he gave Medconsult a "security interest in plaintiff's receivables." In a December 8, 2022 declaration opposing the same motion, Attorney Browne averred that "Uwaydah had been the primary principal for plaintiff since its inception."

---

[10] Hunt's deposition was originally scheduled for June 7 but had to be continued; according to respondents, the continuation was required due to a last-minute request for an interpreter.

[11] The appellate record contains only a single page from Hunt's deposition transcripts, in which he stated, "I am very sorry but it's 9 p.m. here, and my wife would also like to use the bedroom, where I am right now, so unfortunately, I cannot stay at this topic for any longer today."

17

However, at a January 5, 2023 hearing, three weeks after the court had ordered a bench trial on the issue of whether Uwaydah was Frontline's alter ego, Attorney Browne informed the court that Uwaydah had transferred his ownership interest to a creditor in "early 2022." That creditor was Medconsult, who purportedly had a ten million dollar arbitration award against Uwaydah.[12] At a January 11, 2023 hearing, Browne further claimed Uwaydah was not paid a "flat sum" for the sale of his interest in Frontline, but that transferring the ownership interest was a "mechanism to try to satisfy the debt he owes."[13] Browne contended Uwaydah was subject to "debtor's prison" should he be unable to "make his creditors happy." But, at the alter ego trial, respondents' legal expert testified that the type of debt claimed to be owed by Uwaydah to Medconsult would not land Uwaydah in debtor's prison.

---

[12] When questioned about this arbitration award, Medconsult's PMQ testified Medconsult had lost all records associated with either the underlying joint venture or the arbitration, except for the award itself.

[13] But Frontline later produced a January 11, 2022 contract providing that Medconsult purchased Uwaydah's interest in Frontline for one million dollars. Medconsult's PMQ testified at his deposition that Frontline's assets were "a lot of money" (estimated to be in the "millions") at the time of sale.

### D. *Facts Relating to Alleged Misrepresentations Regarding Uwaydah's Ability to Travel to Los Angeles*

#### 1. Motion in Limine

In a November 29, 2022 motion in limine, respondents claimed that Uwaydah was named a "person of interest" in the murder of an associate and that, as soon as one of Uwaydah's associates was arrested for that murder, Uwaydah "covertly fled to the non-extradition haven of Lebanon." In 2015, a Los Angeles County grand jury issued a 57-count indictment against Uwaydah for healthcare fraud, and a bench warrant was issued for his arrest. In 2019, a Riverside County grand jury issued a 90-count indictment against him for healthcare fraud, and another bench warrant was issued for his arrest.

In opposing that motion, Frontline claimed Uwaydah was not a fugitive because, when he left the United States in 2010, there were no criminal charges pending. However, Frontline admitted Uwaydah had "decided that he will not return to the United States." Along with its opposition, Frontline filed a declaration from Uwaydah, in which he disputed that he fled the United States but declared that "[a]fter the indictment in 2015, I opted not to return to the United States."

#### 2. Request for Protective Order

On July 26, 2022, the court granted respondents' motion to preclude Uwaydah from testifying remotely at trial. In late November 2022, Frontline noticed Uwaydah's deposition for December 9, 2022. On December 5, 2022, respondents brought an ex parte application to preclude Uwaydah's deposition, characterizing the notice as "a transparent attempt to circumvent

19

the Court's July 26, 2022 Order."  In a December 8, 2022 declaration opposing the ex parte, Attorney Browne stated: "When the indictment was issued in 2015 and named Dr. Uwaydah, the District Attorney gave notice to the government of Lebanon concerning the criminal matter. . . .  I am informed that under Lebanese practice, the government takes the passport of the affected individual, and issues a 'do not travel' order as to that individual. Lebanon does not provide for extradition, but does allow for a trial to be conducted there concerning the charges.  Currently, Dr. Uwaydah has no passport and cannot travel outside of Lebanon."

In their reply, respondents again reiterated the evidence supporting its theory that Uwaydah was a fugitive and alter ego of Frontline and argued the unfairness of Frontline being able to present testimony from Uwaydah, as that would "result in the presentation of essentially Frontline's entire case-in-chief without the constitutional safeguard of an enforceable witness oath."  In other words, respondents contended Frontline should not be able to present Uwaydah's deposition testimony at trial when Uwaydah's residence in Lebanon permitted him to testify at deposition without being concerned about a perjury charge from a California court.

At the December 16, 2022 hearing on the request for protective order, Frontline's counsel represented to the court that the issue of perjury could be solved by Uwaydah agreeing to be extradited to the United States to face a charge of perjury related to this case.  The court agreed to continue the hearing for the parties to further brief the issue.

On January 3, 2023, Uwaydah signed a declaration and waiver, purporting to "express [his] irrevocable agreement to be

20

extradited by the judicial authorities in the United States of America for the crime of perjury" relating to his deposition.

At a January 5, 2023 hearing, in discussing whether Uwaydah was willing to appear at trial in Los Angeles, Attorney Browne hypothesized that if Uwaydah told the Lebanese and United States governments: " 'Please allow me to travel back to the United States because I want to report to the L.A. County. I want to allow myself to be tried in that case. Will you lift my no-travel restriction and give me my passport? Will the U.S. let me come in?' I guarantee you, that they will all agree. That will happen. That's why the only thing that really matter[s] here is this statement that he said he wasn't going to come."

On April 20, 2023, a letter purporting to be from Mohamed Al, Ajouz, Chancellor, was filed with the court. A translation of the letter asked the court to accept "the enclosed decree in approval of a petition regarding Dr. Munir Uwaydah" and stated that the "Council of Ministers irrevocably undertakes, despite the absence of an extradition treaty between Lebanon and the United States, that the Government of Lebanon will accept and honor the extradition request with respect to the subject matter of the attached decree. If the extradition request contains sufficient probable grounds to justify a perjury charge of Munir Uwaydah in the referenced case, he will be extradited in accordance with the request." A translation of the attached decree stated that Justice Hassan al Hajj Chehade accepted Uwaydah's waiver of extradition and consented to "any future request that the United States of America may make to the Lebanese authorities to extradite the applicant for the offense of perjury in the Case filed under number 19STCV26512 . . . before the 'Superior Court of the State of California, County of Los Angeles' provided that such

21

request is accompanied by a reasonable legal reasoning, including specific citations for acts of perjury."

### 3. Application to Continue Trial

On June 15, 2023, Frontline filed an ex parte application to continue the July 5, 2023 alter ego trial. Accompanying this application was a declaration from Uwaydah, in which he claimed that "[a]t no point have I resisted extradition" but "my passports are still in the possession of Lebanese law enforcement and I remain in limbo and under a travel ban. I cannot leave Lebanon without breaking the law."

### E. *Respondents' First Motion for Terminating Sanctions*

On March 4, 2022, respondents moved for terminating sanctions or, in the alternative, for issue, evidentiary, and monetary sanctions against Frontline. Respondents argued Frontline had failed to comply with the court's orders to provide substantive supplemental discovery responses to their discovery requests as outlined above. With the court's permission, respondents also later submitted a declaration about Frontline's failure to appear at the March 25 deposition of its PMQ. As discussed above, Browne filed a declaration explaining that non-appearance and also claiming that he had served all outstanding discovery responses.

On May 27, 2022, the court denied the portion of respondents' motion seeking terminating or evidentiary sanctions but awarded monetary sanctions in the amount of $7,500. The court found: "Plaintiff's failure to comply with his discovery obligations and with the orders of this Court is undisputed, and

Plaintiff's counsel's justifications for these failures are insufficient."

### F.    *Respondents' Second Motion for Terminating Sanctions*

On December 13, 2022, respondents again moved for terminating sanctions.  Respondents contended Frontline violated the court's order to produce a PMQ for deposition because David Livingston's knowledge of the topics for deposition was wholly insufficient; he answered with some variant of "I don't know" over 500 times in the deposition.

Frontline opposed the motion, arguing that the "persons most knowledgeable for plaintiff are located overseas, and were unable to obtain travel documents for appearing live in Los Angeles.  They were available for deposition by remote means." Frontline acknowledged Livingston "performed poorly at the deposition" but claimed to have resolved the issue because "Plaintiff has gone through the deposition transcript, and provided the requested information."  Frontline submitted a statement responding to respondents' separate statement, signed by Attorney Browne.

In their reply, respondents argued that "Frontline's proffer of attorney responses to the deposition questions 30 days after the fact does nothing to cure the empty deposition record, it only makes it worse" because it deprived respondents the right to cross-examine the deponent.

On March 8, 2023, the court denied respondents' motion but ordered Frontline "to either make its person most qualified available for a subsequent deposition of up to seven hours at a time and place of Defendants' election, after complying with the Court's preparation requirements described herein" or, at

respondents' "sole election, make Munir Uwaydah and/or Janek Hunt available for remote deposition at a time of Defendants' choosing." The court also struck Frontline's "post-deposition written answers" and ruled that, "in the absence of adequate substantive responses provided in the upcoming deposition, Plaintiff will be bound by the initial answers given during the first deposition sessions when and if this matter comes to trial." The court found that the deponent's poor performance was due to one of three possibilities: either the deponent "did a poor job of remembering the information he was given," or "Plaintiff's counsel failed to divine many of the questions that would fall within the PMQ categories," or "Plaintiff willfully flouted the Court's order by producing an ignorant witness." The court "rejects the idea that the record reflects willful opposition to the Court's order" and was "unpersuaded that any prejudice [caused by the problematic deposition] cannot be remedied by a second deposition of a properly prepared corporate witness." The court ordered Frontline to "prepare its corporate designee fully." It also ordered "[t]he costs of a second deposition session, including any attorney's fees expended by Defendants' lead inquisitor during the deposition itself, shall be borne by Plaintiff."

### G.  *Respondents' Motion in Limine*

On November 29, 2022, respondents made a motion in limine to dismiss the case or, alternatively, preclude Frontline from introducing evidence unless Uwaydah—Frontline's alleged alter ego—appeared at trial. Respondents argued that "Frontline was a 'fake company' and Uwaydah was the true plaintiff who had been unable to bring the lawsuit himself because he was "a fugitive of the criminal justice system." Regarding alter ego, respondents pointed to statements from Paul Turley about how

24

he was only an owner of Frontline "[o]n paper" but that all decisions regarding Frontline were made by Uwaydah, that Secretary of State filings listing officers were false, that Frontline had no board meetings, and that Uwaydah had "fled the United States to Lebanon in June of 2010," telling Turley "he was worried about the ongoing fraud investigation." Respondents also detailed how Frontline had no corporate activity or employees, and how Uwaydah had claimed other entities he "owned or was involved in" had paid respondents on behalf of Frontline. Regarding Uwaydah's fugitive status, respondents cited his departure from the United States in 2010 as discussed above.

Frontline opposed respondents' motion, arguing that alter ego and the fugitive disentitlement doctrine were unpleaded affirmative defenses, and even had they been properly pleaded, they should be determined at a trial and not through motions in limine. Frontline also claimed Uwaydah was not a fugitive. Frontline additionally argued respondents "invented" the "fugitive disentitlement doctrine," contending "[t]here is no such rule or doctrine." Finally, Frontline disputed respondents' alter ego evidence, claiming it lacked foundation or was misleadingly presented.

In their reply, respondents disputed that the fugitive entitlement doctrine—which they asserted had been judicially recognized for over a century—was required to be pleaded as an affirmative defense and restated why Uwaydah was a fugitive and Frontline's alter ego. Respondents also pointed out that Uwaydah's residency in Lebanon—a non-extradition state—coupled with his stated refusal to return to the United States "wholly immunized" him from California perjury laws.

25

On December 16, 2022, the court set a bench trial for May 23, 2023, to determine the alter ego issues raised in respondents' motion.  Due to the substitution of new counsel discussed above, the court continued the trial to July 5, 2023.  On June 15, 2023, Frontline filed an ex parte application to continue the July 5, 2023 alter ego trial.  Frontline's new attorney (McMahon) stated he was moving to withdraw because "unbeknownst to him" when he took the case, "there was a significant amount of late discovery and other critical pre-trial prep work that had not yet been completed" and the "overload of work became too much" for the attorney.  The alter ego trial began on July 14, 2023.

### H.    *Respondents' Third Motion for Terminating Sanctions*

On September 1, 2023, respondents filed their third motion for terminating sanctions "on the grounds that Frontline has perpetrated a pervasive and ongoing fraud on this Court, repeatedly violated the Court's orders and abused the discovery process, rendered a fair trial impossible, and caused irreparable prejudice to Defendants."  Respondents alleged four bases for their motion.

### 1.    Browne's Purported Conflict

Respondents argued that, although Attorney Browne had declared on May 8, 2023 that he had a mandatory conflict that required him to cease his representation of Frontline, testimony from both Turley and Woodley indicated he continued to work on Frontline's behalf, preparing these witnesses for testimony.  Respondents also pointed out that Attorney Shohet "stood in the same position as Browne by virtue of being subject to the same contempt charges for substantially the same conduct on behalf of

the same client," yet believed the conflict could be resolved via a waiver from Frontline.

### 2. Discovery Abuses

Respondents listed the myriad ways—discussed *ante*—in which Frontline had violated court orders and abused the discovery process. Respondents' recitation spanned over nine pages.

### 3. Misrepresentations Regarding Frontline's Ownership

Respondents contended Frontline deceived the court regarding its ownership. Respondents pointed out that from the inception of the case until December 8, 2022, Frontline represented that Uwaydah was its "primary principal," but starting in January 2023, began claiming Uwaydah had transferred his ownership interest to Medconsult in "early 2022." Respondents also pointed to the contradictory claims regarding whether Uwaydah was paid a flat sum for his interest in Frontline, and whether Uwaydah was really subject to debtor's prison should he not pay his debt to Medconsult. Respondents argued that an agreement for Medconsult to pay Uwaydah for his shares in Frontline would be nonsensical because Medconsult had a 2005 security agreement in all of Frontline's assets, and because Medconsult believed Frontline's assets to be "a lot of money" (estimated to be in the "millions") at the time of sale; respondents derided the notion that Uwaydah would have sold something worth multiple millions of dollars for one million dollars.

27

### 4. Uwaydah's "Fugitive" Status

Respondents pointed out that, in July 2022, Frontline told the court that Uwaydah had chosen not to come to the United States to testify because he did not wish to subject himself to the criminal charges filed against him. In January 2023, Frontline's counsel reiterated this to the court that if Uwaydah wanted to come to the United States, counsel "guarantee[d]" that the Lebanese and United States government would permit him to do so. However, Frontline later claimed that Uwaydah could not legally leave Lebanon.

## I. *Frontline Opposes the Motion for Terminating Sanctions*

On March 20, 2024, Frontline filed an opposition to respondents' motion.

### 1. Browne's Purported Conflict

Frontline claimed that, after Browne withdrew as counsel, he provided files and information to new counsel, "finished preparing witness Amber Woodley so she could testify as a PMQ for Frontline," and "met with Paul Turley on one occasion." Frontline asserted that by meeting with Woodley and Turley, Browne "properly discharged an important ethical duty to Frontline by making himself available and finishing work, namely the witness preparation, that he had begun and was best prepared to complete." Frontline argued this work "was not related to and did not implicate the conflict [Browne] had."

As support, Frontline filed a declaration from "an expert in legal ethics and professional responsibility," who had been retained to opine on Browne's withdrawal and assistance after withdrawal. The expert concluded that Browne's withdrawal was

28

appropriate "because of the contempt proceedings against Mr. Browne in April 2023, which were then set for hearing beginning on May 8, 2023, the same day that the final status conference in this case was to be held, and the likelihood that Mr. Browne's testimony in his defense could potentially harm Plaintiff's interest."  The expert also declared that his post-withdrawal work was appropriate "since the trial date on the contempt proceeding had been continued, [and] Mr. Browne's assistance was aimed at avoiding prejudice to Plaintiff as a result of Mr. Browne's withdrawal . . . , and was comprised of work which was unrelated to the conflict that caused Mr. Browne's withdrawal."[14] However, the expert admitted she "d[id] not know the specific details of Mr. Browne's defense to the contempt charge, or the implications for Plaintiff's interests" and was "accepting the validity of his representations on that issue."  Similarly, she "rel[ied] on and accept[ed] Mr. Browne's stated conclusion that the conflict was one that was not waiveable [sic] by Plaintiff."

As to Shohet's belief that any conflict he had could be waived, Frontline asserted Browne and Shohet were in different situations because "[t]he charge against Shohet is based on a single letter he wrote in civil litigation, which falls squarely within the scope of the litigation privilege," but "Browne's three-plus year representation of Medconsult and its domestic subsidiaries as they sought to reclaim their real properties broadens the scope of the contempt proceeding and makes him more vulnerable."  "Browne's concern is that he could prejudice Medconsult and Frontline if were placed in a position of having to

---

[14] The expert contended that on May 8, 2023, "the district attorneys moved to continue hearing on the contempt, which resulted in a continuance of that hearing to July 14, 2023."

testify in his own defense," whereas "in the unlikely event Shohet might have to testify, the letter and its content would be the subject matter."

### 2. Discovery Abuses

Frontline admitted that it had "difficulties" in "timely complying with discovery requests," but denied any of its conduct was willful. Frontline blamed its untimeliness on "being unable to track down documents and information located overseas, after most of Frontline's files in Los Angeles had been seized pursuant to raids and search warrants." Additionally, Janek Hunt, "who had maintained many of Frontline's records, was jailed in Riverside County for more than three years and was not released until April 2022." As for depositions, Frontline claimed that Helou and Mohsen were Medconsult shareholders and directors and that Frontline has no ability to insist they be deposed, and did not agree to produce them for deposition. Frontline provided explanations for the difficulties in scheduling the Frontline PMQ deposition and accused respondents of "mischaracterizing" what occurred at the Kassir and Hunt depositions.

Frontline also asserted it could not be accused of violating the court's April 27, 2023 order because it was a void order; Frontline argued the court lacked authority to compel a deposition of officers, directors, managing agents, or employees of a party on an ex parte basis.

### 3. Misrepresentations Regarding Frontline's Ownership

Frontline did not respond to the claim that it made misrepresentations regarding its ownership in its opposition. However, in the declaration of Attorney Browne accompanying

30

the opposition, he argued that his statement that Uwaydah was Frontline's principal at "all relevant times" did not contradict the January 2023 assertion that Uwaydah had transferred his ownership interest to a creditor in "early 2022."

In an accompanying declaration from Uwaydah, he claimed the sale of his shares of Frontline to Medconsult was "in consideration for a $1 million reduction of debt" and claimed he "d[id] not benefit either way if Frontline recovers money because of this current lawsuit or not." Uwaydah explained that Frontline had "many millions of dollars in receivables in the form of medical liens which it is pursuing in workers' compensation proceedings," and Medconsult could not foreclose on Frontline's assets "because that would likely be perceived as an assignment in the workers' compensation courts, require Medconsult to become directly involved in the workers' compensation proceedings, and likely void the receivables because of very specific workers' compensation laws prohibiting the assignment or transfer of liens."

Frontline also disputed respondents' claim that Uwaydah was not subject to debtor's prison for nonpayment of his debt to Medconsult—Frontline submitted a declaration from a Lebanese attorney stating he was.

### 4. Uwaydah's "Fugitive" Status

Frontline also did not respond to this claim in its opposition except to refer the court to a concurrently filed declaration from Uwaydah. In that declaration, Uwaydah claimed he left the United States not because of any pending indictment, but because he was cut off from all financial resources. He later decided to stay in Lebanon when he realized there was "nothing to go back to in Los Angeles" and that the reputational damage

31

he suffered was irreversible. Uwaydah reaffirmed he had surrendered his Lebanese and United States passports in October 2015 and since then, could not travel outside Lebanon. He added that his Lebanese attorney "made multiple applications to the Prosecutor General's Office to have the travel ban lifted and my passports returned, but all our applications to date have been denied." Uwaydah claimed he never advised anyone that he was unwilling to return to Los Angeles.

### J. *Respondents' Reply*

In their reply, respondents pointed out that on June 13, 2023—*after* the district attorney had continued the May 8 contempt hearing—Frontline still submitted a declaration from Attorney Browne stating that due to the contempt matter, he "had to withdraw as it created a mandatory conflict with [his] client that could not be waived." Thus, contrary to Frontline's argument that the continuance permitted Browne to work with Turley and Woodley, even after the continuance occurred, Browne still declared he had an unwaivable, mandatory conflict.

Respondents also pointed out that, even setting aside the fact that Frontline provided no legal authority to support its claims that workers' compensation laws prohibited the assignment or transfer of liens, it made no sense for Medconsult to become Frontline's owner for one million dollars—Medconsult could have simply waited for Frontline to collect on its liens and then foreclosed on Frontline's assets through the already existing security agreement.

### K. *The Court Imposes Terminating Sanctions*

On October 27, 2023, the court granted respondents' motion for terminating sanctions and dismissed all defendants with

prejudice in a 19-page order.  The court stated it had the "authority to impose sanctions against a party that engages in any misuse of the discovery process" and the "inherent power to dismiss an action 'when the plaintiff has engaged in misconduct during the course of litigation that is deliberate, that is egregious, and that renders any remedy short of dismissal inadequate to preserve the fairness of the trial.' "  The court addressed each of the four bases respondents proffered for imposing terminating sanctions.

### 1.    Attorney Browne's Conflict of Interest

The court noted that, on May 4, 2023, Browne asserted under penalty of perjury that "his withdrawal [as Frontline's counsel] was necessary because he had been charged with contempt in connection with a related criminal proceeding in which he represented Medconsult S.A.L., another corporate entity whose exact relationship to Plaintiff and Uwaydah has been hotly contested but is unquestionably connected to these proceedings.  [Citation.]  Attorney Browne represented that the resulting conflict of interest 'may or may not be waivable,' but that he had concluded he could not continue as counsel for Plaintiff while the contempt proceeding was ongoing."  On June 15, 2023, Browne submitted another declaration, "this time stating under penalty of perjury that the conflict was a nonwaivable conflict of interest that mandated withdrawal."  Yet, at the July 2023 alter ego trial, Turley testified that he "had spoken to Attorney Browne, acting as counsel for Plaintiff, several times over the previous two months, and that the witness had been provided with information from Attorney Browne that led to the witness changing his testimony."  Additionally, "[f]ive days earlier, at a deposition of Plaintiff's Person Most Qualified,

33

the PMQ witness also stated that she had met with Attorney Browne multiple times in the previous month to prepare for her deposition."

The court discounted the testimony of Frontline's "expert on professional responsibility and legal ethics" who opined that "based on Attorney Browne's belief that he had an irreconcilable conflict of interest, that his conduct was proper." The court faulted the expert's "blind acceptance" of Browne's conclusions about the supposed conflict and acceptance "without scrutiny" of Browne's assertions about the propriety of his actions post-withdrawal, the court "finds the expert testimony to be lacking in any persuasive force, if not wholly inadmissible."

The court compared Browne's alleged conflict with that of Shohet's, who had a similar conflict that he deemed waivable. The court stated it was unconvinced that the two situations were materially different.

The court also disregarded the claims of both Attorney Browne and the expert that "the serious conflict created by Attorney Browne being required to give testimony in the contempt proceeding was obviated by a subsequent continuance of the contempt proceeding," pointing to the declaration Browne submitted after the continuance, still claiming the conflict was unwaivable.[15]

_____

[15] The court also characterized as "utterly specious" Frontline's argument that its April 27, 2023 order was void because a court could not compel a deposition on an ex parte basis. After stating that it could, in fact, compel a deposition on an ex parte basis, the court noted that, as to two of the deponents (Uwaydah and Hunt), the court had already ordered their depositions on March 8, 2023 in response to a previous motion to
*(Fn. is continued on the next page.)*

34

The court therefore found "the declarations offered by Plaintiff to be lacking in credibility for the purpose of establishing that Attorney Browne's post-withdrawal conduct was either necessary or proper." It concluded that: "Even a straightforward examination of the record reveals multiple incidents of conduct by Attorney Browne that cast a pall over the proceedings in this case and strongly suggest that, at a minimum, he capitalized on his contempt charges by exaggerating the impact of any conflict to derail the discovery sanctions hearing and delay the trial and that, at Plaintiff's behest, he perpetrated a fraud on the Court by providing key litigation assistance in connection with two critical witnesses after entreating the Court to excuse him from representing Plaintiff because of a serious ethical conflict that could not be waived. The specious and conclusory justifications offered by Plaintiff for Browne's actions do not suffice to dissuade the Court from this conclusion." The court added: "If this were the only allegation of wrongdoing leveled by Defendants, the Court could grant terminating sanctions simply based on the apparent disrespect for the judicial system displayed by Plaintiff. As Defendants have taken great pains to show, however, this is not the only allegation proffered."

---

compel, so the April 27, 2023 order "was an order compelling compliance with the Court's previous ruling, and therefore within the Court's authority to compel obedience to its orders." As to the other deponents, "the Court simply directed Plaintiff to provide available dates for depositions of witnesses Plaintiff had already agreed to produce, after it failed to object to Defendants' deposition notices."

### 2. Abuse of Discovery Process

The court listed a plethora of Frontline's abuses of the discovery process, citing numerous issues with taking the deposition of Frontline's "PMQ" and "similar instances of disruption in the depositions of Janek Hunt, as the present custodian of Frontline's electronic records, and Adib Kassir, the purported owner of Plaintiff through Medconsult, including a refusal to answer questions, lengthy and repeated breaks, and sudden termination of the deposition." The court also cited to two deponents—Mohsen and Helou—who had yet to sit for their deposition, despite court orders compelling those depositions, and to "various instances of Plaintiff's failure to respond to basic discovery requests."

The court discounted Frontline's contention that "it did not willfully fail to comply with its discovery orders," categorizing its explanations as "piecemeal excuses." The court noted "the sheer number of incidents where Plaintiff has blown through deadlines, violated Court orders on their face, or otherwise failed to adhere to its discovery obligations commands the conclusion that Plaintiff has demonstrated a pattern of willful noncompliance. As the saying goes, 'once is happenstance. Twice is coincidence. Three times is enemy action.' Plaintiff has failed to comply with its discovery obligations and court orders considerably more frequently than that."

### 3. Misrepresentations Regarding Ownership of Frontline

The court found that Frontline had committed a fraud on the court by misrepresenting Uwaydah's ownership interest in Frontline in an effort to persuade the court to permit Uwaydah's deposition testimony to be used at the alter ego trial. It noted

that, before it had ordered an alter ego trial, Frontline "consistently represented that Munir Uwaydah was Plaintiff's owner and primary principal," a representation last made on December 8, 2022. After the court ordered the trial and the court indicated its intention to bar Uwaydah from testifying remotely, "Attorney Browne stated in open Court on January 5, 2023 that Uwaydah no longer owned Plaintiff, and that it instead belonged to his creditors and had since 2022, thus contradicting Plaintiff's previous representations, including those made by Attorney Browne just a month earlier."

Furthermore, "[w]hen the Court later asked Plaintiff to explain Uwaydah's strong interest in giving testimony in this action if he no longer owned Frontline, Plaintiff represented that Uwaydah had transferred his interest to his creditors in satisfaction of his debts, with the value of that interest contingent on the outcome of the action." The creditor Frontline named was Medconsult. Frontline also claimed Uwaydah faced the prospect of "debtor's prison" should he fail to satisfy his creditors. But respondents presented "considerable evidence demonstrating that Plaintiff's representations were, at best, highly misleading, if not wholly false." Specifically, "Plaintiff's assets had long been committed to Medconsult, another entity closely tied to Munir Uwaydah," and Uwaydah "faced no threat of debtor's prison." Additionally, Medconsult " 'lost' all documentation that might corroborate the underlying dispute that led to the $10 million arbitration award or that substantiates that any arbitration occurred." Respondents also uncovered an agreement that Uwaydah sold Frontline to Medconsult not for some value contingent upon Frontline's recovery in these proceedings, but for forgiveness of one million

37

dollars in debt. But the court found this agreement "highly suspicious" because "Medconsult had a security interest in all of Frontline's assets dating back to 2005, so it could have used Uwaydah's debt to foreclose on Frontline and had no business incentive to pay Uwaydah anything to secure this asset."

The court concluded Frontline "seriously misrepresented the ownership of Frontline, the risks posed to its chief witness, and the nature of Uwaydah's continued interest in this action and did so in a truly egregious manner."

### 4.    Uwaydah's Fugitive Status

The court noted that Frontline initially stated that Uwaydah "did not wish" to travel to the United States when there was a pending criminal prosecution against him, although "he could do so." Later, Frontline asserted Uwaydah could not leave Lebanon without breaking the law. While the court found these contradictory statements alone insufficient to warrant terminating sanctions, "the extensive discussion of Defendants' other contentions, supra, shows that these statements do not stand by themselves, but are instead one thread in a larger tapestry of misconduct."

### 5.    Conclusion

The court recounted how it had previously denied respondents' request for terminating sanctions because "Defendants had not, at that time, established to the Court's satisfaction that the ultimate sanction was the appropriate remedy for the injury inflicted by Plaintiff's conduct, or that the totality of the circumstances warranted such measures." However:

"In the months that followed, much has changed with respect to the posture of this case. One feature that has remained constant is Plaintiff's failure to comply with this Court's orders, with statutes, with governing precedent, and with basic principles of justice and fairness. Plaintiff has persisted in this behavior, utterly unmoved by monetary sanctions, evidentiary sanctions and threats of greater punishments. Moreover, Plaintiff has made numerous misrepresentations that, construed in anything but the most generous light, constitute outright fraud perpetrated on this Court. Whether or not any single instance of misconduct discussed herein by Plaintiff might have warranted terminating sanctions, the picture that emerges in the aggregate is of a party who simply does not respect Defendants, their counsel, the law, or this Court. It is therefore abundantly clear that a lesser sanction will not suffice to prevent future misconduct. Plaintiff has made a mockery of the judicial process and has abused this Court's patience for nearly two years. The Court cannot and will not permit Plaintiff to continue to do so."

In December 2023, the court entered judgment in favor of respondents, awarding them costs and attorneys' fees "according to proof as determined by the Court." Frontline timely appealed. In March 2024, the judgment was amended to award respondents "costs in the amount of $263,058.42." Frontline does not challenge the costs amount.

## DISCUSSION

The court imposed terminating sanctions using both its inherent authority and its authority to impose sanctions against a party engaging in abuse of the discovery process. "We accept

the trial court's factual determinations concerning misconduct if they are supported by substantial evidence." (*Osborne v. Todd Farm Service* (2016) 247 Cal.App.4th 43, 51.) "We review the order to issue a terminating sanction based on those factual findings for abuse of discretion." (*Ibid.*) "In deciding whether the trial court's . . . order terminating the action as a sanction for misconduct constituted an abuse of discretion, we 'view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. [Citation.] We also defer to the trial court's credibility determinations. [Citation.] The trial court's decision will be reversed only "for manifest abuse exceeding the bounds of reason." ' " (*Ibid.*)

### A. *The Court Did Not Err in Imposing Terminating Sanctions Using Its Inherent Power*

"California courts possess inherent power to issue a terminating sanction for 'pervasive misconduct.' " (*Osborne v. Todd Farm Service, supra*, 247 Cal.App.4th at p. 51.) Here, using its inherent power, the court imposed terminating sanctions for Frontline's misrepresentations about Attorney Browne's conflict of interest, about the ownership of Frontline, and about Uwaydah's willingness and ability to travel to Los Angeles. Substantial evidence supports each determination of misconduct.

### 1. Browne's Conflict

Frontline does not dispute that Browne declared an unwaivable conflict of interest and performed work for Frontline thereafter. Instead, Frontline argues the court erred in issuing terminating sanctions based on alleged misrepresentations regarding Browne's conflict because: (a) statements made by Browne should not be imputed to Frontline; (b) Browne did only

40

what was necessary after his withdrawal to avoid prejudicing Frontline; (c) Frontline had no "ulterior motive" behind Browne's withdrawal.

### (a) Imputation of Browne's Actions

While Frontline admits that "the sins of an attorney may be chargeable to the client," it claims an exception for an attorney's "positive misconduct." Specifically, excepted from the rule that the negligence of an attorney is imputed to the client " 'are those instances where the attorney's neglect is of that extreme degree amounting to *positive misconduct*, and the person seeking relief is relatively free from negligence." (*Carroll v. Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892, 898.) This exception is inapplicable because Frontline is not "relatively free from negligence." Frontline knew of and condoned Browne's actions. Indeed, in its appellate briefing, Frontline openly admits that it "does not mean to suggest that Browne did anything wrong. To the contrary, Appellant perceives Browne as honorable, ethical, and highly capable."[16]

---

[16] Thus, Frontline's reliance on *Orange Empire Nat'l Bank v. Kirk* (1968) 259 Cal.App.2d 347, 353; *Daley v. County of Butte* (1964) 227 Cal.App.2d 380, 391 is misplaced. (*Orange Empire Nat'l Bank*, at p. 353 ["where a client is unknowingly deprived of effective representation by counsel's failure to serve process, to appear at the pretrial conference, to communicate with the court, client, and other counsel, and the action is dismissed by reason of the attorney's misrepresentation, the client will not be charged with responsibility for the misconduct of nominal counsel of record, providing the client acts with due diligence in moving for relief after discovery of the attorney's neglect, and the opposing party's rights will not be prejudiced nor suffer injustice as a
*(Fn. is continued on the next page.)*

41

## **(b)** **Necessity of Browne's Actions**

Frontline claims that, in preparing Woodley for deposition and speaking with Turley, Browne was "tak[ing] reasonable steps to avoid prejudicing a client when terminating representation." Specifically, Frontline claims Browne was adhering to Rule 1.16 of the California Rules of Professional Conduct. But Rule 1.16(d) provides: "A lawyer shall not terminate a representation until the lawyer has taken reasonable\* steps to avoid reasonably\* foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel, and complying with paragraph (e)."[17]

By its very language, this rule applies to an attorney's actions *before* he terminates his representation. If Browne believed that terminating his representation of Frontline was unethical without finishing his preparation of Woodley and

---

result of the granting of relief"]; *Daley*, at pp. 391–392 [attorney "inflicted severe damage on his client's case" by his "unexplained failure to serve process; by his failure to appear at successive pretrial conferences, if only for the purpose of seeking extensions or making explanations; by his failure to communicate with court, client and other counsel; by holding the substitution of attorneys for more than five months while his client's cause ripened for disaster; by his refusal to get on with the lawsuit or get out of it"].)

[17] Paragraph (e) addresses releasing client materials and property and returning unearned fees. (Rules Prof. Conduct, rule 1.16(e).) The rules also provide that "An asterisk (\*) identifies a word or phrase defined in rule 1.0.1." Rule 1.0.1(h) provides: " 'Reasonable' or 'reasonably' when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer."

42

speaking with Turley, then it was incumbent upon him to do so before terminating his representation. He did not. Frontline provides no authority permitting an attorney who has terminated a representation due to an unwaivable conflict to still represent and perform work for that client after the termination, just because doing so would help that client.

### (c)    Ulterior Motives

Finally, Frontline argues that Browne "did not invite a meritless civil contempt charge against himself to assist Appellant in gaining a tactical advantage in the underlying case." Neither the court nor respondents asserted that he did. Rather, as the trial court stated, respondents' "theory is not that he made affirmative efforts to be charged with contempt. Rather, Defendants argue that Plaintiff employed those charges, once leveled, as a justification to disrupt these proceedings."

Frontline also argues it cannot be penalized for failing to comply with the court's April 27, 2023 order because the order was in excess of the court's jurisdiction. Specifically, Frontline contends "a noticed motion and hearing are required to compel a deposition rendering the order void." We agree with the trial court and our colleagues in Division Seven who held: "The discovery law contemplates a need may arise for an ex parte motion to compel a witness to appear and answer questions at a deposition." (*Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 295.)

### 2.    Ownership of Frontline

On appeal, Frontline does not contend the court erred in finding it made material misrepresentations about its ownership. As discussed above, substantial evidence supports this finding.

43

### 3. Uwaydah's Willingness and Ability to Travel to Los Angeles

While the court found that Frontline's misrepresentations regarding his ability to leave Lebanon "do not suffice by themselves to demonstrate that the ultimate sanction is warranted," they were "one thread in a larger tapestry of misconduct."

Frontline asserts there were no misrepresentations: Uwaydah "has remained in Lebanon because he cannot leave" and cannot "extradite himself." But Uwaydah's purported extradition waiver for perjury charges and the Lebanon Council of Ministers' acceptance of this waiver belie Frontline's claim— apparently, as Attorney Browne explained to the court, as long as Uwaydah agreed to the extradition, "I guarantee you, that they will all agree. That will happen."

Substantial evidence supports the court's theory that Frontline intentionally made misrepresentations to the court regarding Browne's supposed conflict, Frontline's ownership, and Uwaydah's willingness and ability to travel to Los Angeles. Given that misconduct, it did not exceed the bounds of reason for the court to terminate this action.

### B. *The Court Did Not Err in Imposing Terminating Sanctions for Frontline's Abuse of the Discovery Process*

"[T]he court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose the following sanctions against anyone engaging in conduct that is a misuse of the discovery process: [¶] . . . [¶] (d) The court may impose a terminating sanction by one of the following orders:

44

[¶] . . . [¶] (3) An order dismissing the action, or any part of the action, of that party." (Code Civ. Proc., § 2023.030.)

### 1. Frontline PMQ Deposition

Respondents initially noticed the deposition of Frontline's PMQ for March 25, 2022. Frontline neither objected to the notice nor appeared at that deposition; Attorney Browne claimed he had missed communications about that deposition.

Browne subsequently informed respondents' counsel that Janek Hunt would be the PMQ, although he was in Estonia. Respondents informed Browne that Hunt's fraud conviction categorically prevented him from obtaining a visa to enter the United States but, on August 23, Browne claimed Hunt should be able to sit for the deposition in a month. On August 29, 2022, respondents noticed the deposition of Frontline's PMQ for September 29, 2022. Although Frontline did not object to this notice of deposition either, again no one appeared on the noticed date.

On October 4, 2022, Frontline offered to provide a witness "with no percipient knowledge who has just been briefed on the subjects." Respondents stated they wanted "a PMQ witness who will testify in a manner compliant with California law," and asked Frontline to provide "which date during the week of October 17 we should re-notice the PMQ deposition for." Browne stopped responding, necessitating a motion to compel, which was granted. Frontline then produced David Livingston as the PMQ; Livingston professed ignorance on over 500 questions posed to him.

After the court ordered Frontline to produce its PMQ again. Frontline failed to provide respondents with dates for that PMQ deposition, leading to an ex parte application to compel

45

compliance with the court's order; the court again ordered Frontline to provide a new date for the deposition. A new PMQ then arrived late to the fourth noticed deposition and left after only two hours of testimony were taken.

Frontline disputes none of this. Instead, it argues it cannot be blamed when the witness "with no percipient knowledge who has just been briefed on the subjects" was "not a good deponent." But the Code of Civil Procedure is clear—when the deponent is not a natural person, "the deposition notice shall describe with reasonable particularity the matters on which examination is requested," and then "the deponent shall designate and produce at the deposition those of its officers, directors, managing agents, employees, or agents who are most qualified to testify on its behalf as to those matters to the extent of any information known or reasonably available to the deponent." (Code Civ. Proc., § 2025.230.) Frontline designated Livingston to be its agent "most qualified" to testify as to the topics of examination noted by respondents. We see nothing unfair about holding Frontline responsible for the quality of its agent's testimony.[18]

### 2. Other Depositions

The court also found "similar instances of disruption" at the depositions of Janek Hunt and Adib Kassir, such as "a refusal to

---

[18] Frontline also contends Woodley's tardiness was simply a matter of getting lost, and respondents were told they could resume the deposition at a later date if they wished; Frontline asserts that it did not seem as if respondents' counsel had more questions for Woodley. As evidence, Frontline cites to Woodley's declaration but fails to include in the record the transcript pages where this offer of resumption was made.

46

answer questions, lengthy and repeated breaks, and sudden termination of the deposition."

Frontline complains respondents noticed too many depositions in too short a time period. But it is undisputed that Frontline neither objected to the deposition notices nor requested the court issue a protective order. Nor does Frontline dispute that on April 19, 2023, its counsel (Browne) promised to provide respondents with workable deposition dates and then failed to do so, despite follow-up emails respondent sent on April 20, 21, and 24, 2023.

Frontline disputes the trial court's determination that the depositions of Hunt and Kassir contained refusals to answer, lengthy breaks, and sudden terminations of the depositions. Frontline has forfeited its argument about Hunt's deposition for failure to supply an adequate record—the only page of his deposition transcript that appeared in the appellate record was where he stated the deposition needed to end because his wife wanted to use the bedroom, where the deposition was remotely taking place.[19] As for Kassir, in the first session of his deposition, he arrived 13 minutes late and then informed the parties that the deposition needed to end in 1 hour and 47 minutes. He also took 18 minutes to answer what documents he had reviewed in preparation for the deposition, and did not even provide a

---

[19] (*Roberson v. City of Rialto* (2014) 226 Cal.App.4th 1499, 1507 [appellant "has a duty to provide an adequate record on appeal to support his claim of error. [Citation.] In the absence of an adequate record, the judgment is presumed correct. [Citation.] 'All intendments and presumptions are made to support the judgment on matters as to which the record is silent' "].)

47

complete answer before asking for a break to go to the bathroom and smoke a cigarette. The second session resulted in only 30 pages of testimony. And the third session lasted a little over four hours, with 54 minutes of breaks.

Substantial evidence thus supports the court's finding that Kassir's deposition was filled with "similar instances of disruption."

### 3. Written Discovery

The trial court also noted "various instances of Plaintiffs failure to respond to basic discovery requests." Although Frontline offered explanations for the issues listed in respondents' motion, the court found that "even if the Court accepted Plaintiff's justifications for any one incident, the sheer number of incidents where Plaintiff has blown through deadlines, violated Court orders on their face, or otherwise failed to adhere to its discovery obligations commands the conclusion that Plaintiff has demonstrated a pattern of willful noncompliance."

Frontline does not deny the myriad instances in which it failed to comply with its statutory deadlines or with court orders to produce written discovery responses and documents. Nor does it deny that the court ordered its compliance several times with escalating sanctions and warned it that nonmonetary sanctions could follow further noncompliance. Frontline instead argues that it eventually "complied with its written discovery obligations and paid monetary sanctions awards related to its prior, untimely responses." We conclude that the many incidents detailed above are substantial evidence to support the court's conclusion that Frontline's failures were more than negligence but constituted "a pattern of willful noncompliance." Even if Frontline's recitation of evidence could support a finding that its

violations were not willful, " '[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)

"[W]here a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction." (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279–280.)[20] Such was the case here.

---

[20] Frontline's cases to the contrary are all inapposite. (See *Crummer v. Beeler* (1960) 185 Cal.App.2d 851, 852, 860 [when only misconduct is defendant's failure to appear at properly noticed deposition, striking defendant's answer and entering his default as discovery sanction too "drastic"]; *Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 572–573 ["court erred in issuing terminating sanctions as the initial remedial measure without first attempting to compel compliance with its discovery orders by using lesser sanctions or by imposing evidentiary or issue sanctions"]; *Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 610 ["order terminating a plaintiff's lawsuit or striking a defendant's answer and entering its default (in effect, terminating sanctions) solely because of failure to pay the monetary sanction is excessive"]; *Caryl Richards, Inc. v. Superior Court of Los Angeles County* (1961) 188 Cal.App.2d 300, 304–307 [striking defendant's answer for willful failure to answer single interrogatory asking for formula of its hairspray—which had allegedly injured plaintiff's eyes— excessive when court could have instead imposed evidentiary sanction that hairspray was dangerous to eyes].)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED


M. KIM, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.